UNITED STATES of America

v.

**Raymond CÁTALA FONFRÍAS, Eduardo Rodriguez Parrilla.**

**Cr. No. 84–418(PG).**

United States District Court, D. Puerto Rico.

July 2, 1985.

As Amended July 31, 1985.

**1000**

Guillermo Gil and Dana Biehl, Asst. U.S. Attys., Washington, D.C., for U.S.

Blas C. Herrero, Wilfredo Figueroa-Vélez, Hato Rey, P.R., Julio Morales-Sánchez, Santurce, P.R., and Rafael Castro-Lang, San Juan, P.R., for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

Defendants Raymond Cátala Fonfrías and Eduardo Rodriguez Parrilla were found guilty on June 6 and June 7, 1985, respectively, after a sixteen-day trial on a two-count indictment charging them with violation of Title 18, U.S.C., §§ 241 and 242. After the verdicts were returned and pursuant to the provisions of 18 U.S.C. § 3143(a) the defendants were remitted to the custody of the U.S. Marshal. This statute provides categorically that "[t]he judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence be detained."

On June 7, 1985, Mr. Cátala Fonfrías, and on June 10, 1985, Mr. Rodriguez Parrilla filed individual motions requesting that they be released on bail pending sentence. A consolidated hearing was held on June 14, 1985, wherein both defendants presented witnesses and so did the government. After considering the testimony of the witnesses, the documentary evidence submitted and the evidence which was admitted during the trial of the defendants, the Court finds that the defendants have not proven by clear and convincing evidence that they will not flee or pose a danger to the safety of any other person or the community. § 3143(a).

Although there is clearly no constitutional right to bail once a person has been convicted,[1] prior to the enactment of the Comprehensive Crime Control Act of 1984,[2] and more specifically Chapter I "Bail Reform Act of 1984", there existed a presumption of releasability even after conviction.[3] It was the expressed desire of the Committee on the Judiciary of the United States Senate[4] to eliminate said presumption with the enactment of Section 3143. The Committee made two significant findings:

1. "Once guilt of a crime has been established in a court of law, there is no reason to favor release pending imposition of sentence or appeal. The conviction, in which the defendant's guilty of a crime has been established beyond a reasonable doubt, is presumably correct in law."

2. ... [R]elease of a criminal defendant into the community after conviction may undermine the deterrent effect of the criminal law, especially in those situations where an appeal of the conviction may drag on for many months or even years."

Under the present statutory scheme the only way that a convicted defendant can be released pending sentence is if he overcomes the newly established presumption in favor of detention. But the Committee took one step further in the same direction by providing that in overcoming the presumption in favor of detention the burden of proof rests with the defendants.[5] Section 3143 provides that the release pending sentence must conform to the "clear and convincing" evidence test. Under this criterion, before a defendant awaiting sentence is released the judicial officer must find by clear and convincing evidence that the person is not likely to flee or pose a

1. *U.S. v. Baca,* 444 F.2d 1292, 1296 (10th Cir.), *cert. denied,* 404 U.S. 979, 92 S.Ct. 347, 30 L.Ed.2d 294 (1971).

2. Title II of H.J.Res. 648, P.L. #98–473.

3. *U.S. v. Bynum,* 344 F.Supp. 647 (S.D.N.Y. 1972).

4. Report of the Committee on the Judiciary, United States Senate, 98th Congress, 1st Session, Report No. 98–225, p. 26, U.S.Code Cong. & Admin.News 1984, p. 3182.

5. *Ibid,* p. 27.

danger to the safety of any other person or the community. But the statute and the Committee Report are silent on the quantum of evidence needed to satisfy the test. The case law up to the present is nil as to this aspect of Section 3143.

■ Recent case law, nevertheless, has discussed an identical criteria established by Congress in 18 U.S.C. § 3142(f)(2)(B).[6] This section also establishes a clear and convincing test with respect to a defendant's danger to the community at the pretrial detention stage. In *U.S. v. Chimurenga, supra,* p. 405, the Second Circuit spoke of the test as meaning "something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'" *See, Addington v. Texas,* 441 U.S. 418, 431, 99 S.Ct. 1804, 1812, 60 L.Ed.2d 323 (1979); *U.S. v. Acevedo Ramos, supra,* at 509. It is a high degree of certainty what lies at the core of this test.

We adopt this same interpretation of the "clear and convincing evidence" test found at Section 3143 for we cannot say that Congress intended the same exact language in two different sections, but within the same statutory scheme, to have two different meanings. Using this criteria as our guideline we next turn to the evidence addressed at the hearing.

## THE CRIME

■ Griselle González Ortiz was a nineteen-year-old female at the time of her violent death. She had been the sole witness against co-defendant José L. Lebrón González in a murder case for which Mr. Lebrón is serving a life sentence. It just so happened that the man Mr. Lebrón killed was also the sole witness against him. For this reason "Jessica",[7] as Ms. González Ortiz was known, was afforded police protection. Around the month of February 1980, Mr. Lebrón, together with co-defendant Eduardo Rodriguez Parrilla and his own co-counsel, co-defendant Raymond Cátala Fonfrias, decided that Jessica had to be killed so she could not testify against Mr. Lebrón. Contact was made with co-defendant Ernesto Gil Arzola, then a supervisor at Bayamón, Puerto Rico, of the Criminal Investigations Bureau, Police of Puerto Rico. He was a corrupt police officer who was a member of the "La Torre" gang. Mr. Cátala Fonfrias knew of this fact because he performed legal services for said gang and as such participated in conversations where criminal activities of members of the gang were discussed.

The idea was for Mr. Gil Arzola to make contact with the detail in charge of Jessica's security and offer a contract for her elimination. Mr. Gil Arzola called Emeterio Ortiz Ortiz, Chief of the Division of Crimes Against Persons and Property for the City of San Juan, at Police General Headquarters, who was responsible for Jessica's protection. According to his own testimony during the Jessica trial, Mr. Ortiz was also a corrupt police officer since 1971.

A contract to kill Jessica was agreed upon between Mr. Gil Arzola and Mr. Lebrón González for the initial price of $15,000.00. Mr. Rodriguez Parrilla would deliver the monies from Mr. Lebrón to attorney Cátala Fonfrias, who in turn would make payments to the two policemen, Gil Arzola and Ortiz Ortiz. On the night of May 27, 1980, and after the third day of the murder trial against Mr. Lebrón had commenced in the Superior Court of Puerto Rico, San Juan Part, Messrs. Gil Arzola and Ortiz decided to put into effect their plan. Mr. Ortiz picked up Jessica in the afternoon after the day's session had concluded and told her that he would escort her under his protection to her home in Arecibo. Little did she know that she would be killed by these two police officers, inside an official government vehicle, on a lonely and desolate road on the way from

---

**6.** *U.S. v. Héctor Acevedo Ramos,* 600 F.Supp. 501 (D.P.R.1984); *U.S. v. Chimurenga,* 760 F.2d 400 (2d Cir.1985).

**7.** The Jessica case, as this trail was commonly referred in the newspapers, received extensive press coverage ever since its inception in May 28, 1980.

San Juan to Arecibo. As the evidence in the case showed, Mr. Gil Arzola fired two shots that killed Jessica while Mr. Ortiz Ortiz drove the car. Later her body was dumped by Mr. Ortiz in an abandoned farm.

### RAYMOND CATALA FONFRIAS:

The evidence adduced at trial against Mr. Cátala was very strong. Not only did Mr. Ortiz single out Mr. Cátala as the payoff man in this conspiracy, but also recorded three conversations with him by means of a hidden body recorder where the murder of Jessica and the amounts paid for the contract were unequivocally discussed. Intercepted telephone conversations between Mr. Cátala and Mr. Gil Arzola were admitted into evidence. These conversations ensued when both of them were subpoenaed by the Justice Department of Puerto Rico in relation to the murder case.

At the detention hearing further information about Mr. Cátala's criminal activity was provided by government agents. This information, fully corroborated by government witnesses and interceptions and consensually recorded conversations, covered the following topics:

1. Suggested to a client of his, and a member of the La Torre gang, to bump off the only witness in a pending robbery case in local court.

2. In his office plans were discussed to kidnap the same witness, which eventually was done, and the case had to be dismissed.

3. Shared in the proceeds of a claim to an insurance company because of an arson to the business of a member of the same gang.

4. Was involved in a plot to help escape from jail a convicted bank robber in a local case.

Mr. Cátala offered character witnesses who, in essence, testified that they have known him through his formative years, that he is not a violent person, and in their opinion he does not present a danger to the community or to any other person.

8. Title 18, U.S.C., § 2510, et seq.

### ERNESTO RODRIGUEZ PARRILLA

Although the evidence presented as to Mr. Rodríguez Parrilla was not as strong and robust as was the evidence against Mr. Cátala, yet he was positively identified as being in the conspiracy to kill Jessica. Mr. Ortiz testified as to numerous meetings where both Mr. Rodríguez and Mr. Cátala were present and where the plans to kill Jessica were discussed. It was Mr. Rodríguez who provided Mr. Cátala with the monies to pay Messrs. Gil Arzola and Cátala. Mr. Ortiz recorded two conversations with Mr. Rodríguez, which were not admitted into evidence because of evidentiary rulings by this Court. Nevertheless, the content was revealed to the Court in order to decide the evidentiary matter. In those two conversations Mr. Rodríguez readily admits the fact that in his presence plans were made to kill Jessica and that he transported money from Mr. Lebrón to Mr. Cátala as part of the contract price.

Finally, during the trial, Mr. Ortiz testified as to a meeting that took place in Mr. Cátala's office on the Sunday following Jessica's murder, where all five co-conspirators were present and where they celebrated the successful execution of the plan. There Mr. Rodríguez became upset with Mr. Gil Arzola because the contract price was raised from $15,000 to $22,000.

Information provided during the detention hearing pointed out that as a result of intercepted communications[8] by the government, Messrs. Rodríguez and Arzola at one time discussed plans to rob a supermarket or its owner, in Cataño, Puerto Rico. On other occasions Mr. Rodríguez discussed with government witness Emeterio Ortiz Ortiz the possibility of using Mr. Ortiz's position within the Police of Puerto Rico as a subterfuge to assault a known narcotics trafficker and steal all his money and split it up between themselves.

The various witnesses presented by this defendant gave their opinion to the Court

that they thought Mr. Rodríguez would not flee the jurisdiction.

Both defendants have brought testimony to the Court that they are not violent nor would they flee the jurisdiction. The evidence presented at trial belies these witnesses. The crime committed by these defendants is by its very nature the most violent of all, that is, the taking of a human life. They were convicted of violations to Title 18, U.S.C., §§ 241 and 242, which each carries a maximum of life in prison, as death resulted. Mr. Cátala faces the additional disgrace of disbarment from the practice of law. The government's main witness, Mr. Emeterio Ortiz Ortiz, is out on bond awaiting sentence in this case and another one to which he has pled guilty as a result of a plea bargain with the government. Certainly, he does constitute a target because it was not until he decided to cooperate with the government that the Jessica murder was finally solved after almost five years.

The propensity of these two defendants to commit crimes of violence, as shown by the information provided to the Court, constitute a sufficient risk of danger to the community to be considered by the Court in denying their motions for release.[9] Furthermore, just recently, after their convictions, the Secretary of Justice for the Commonwealth of Puerto Rico publicly announced that murder charges for Jessica's death would be forthcoming against Messrs. Lebrón, Rodríguez, Cátala and Arzola.

Finally, Mr. Cátala was trying to sell his house, which was posted as security for his release on bail, without advising the Court of this fact so that appropriate substitute guaranty could be placed.

For all the reasons stated above and pursuant to 18 U.S.C. 3143(a), the Court DENIES the motions because the defendants have not shown by clear and convincing evidence that they do not pose a risk of flight or danger to any other person in the community. They shall be held without bond until sentenced.

IT IS SO ORDERED.

---

9. Wright, *Federal Practice and Procedure,* Criminal 2d, Vol. 3A, p. 137.