# ADDINGTON *v.* TEXAS

No. 77–5992.   Argued November 28, 1978—Decided April 30, 1979

BURGER, C. J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the consideration or decision of the case.

*Martha L. Boston,* by appointment of the Court, 436 U. S. 916, argued the cause for appellant. With her on the brief were *Robert Plotkin* and *Paul R. Friedman.*

*James F. Hury, Jr.,* argued the cause and filed a brief for appellee.

*Joel I. Klein* argued the cause and filed a brief for the American Psychiatric Assn. as *amicus curiae* urging affirmance.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question in this case is what standard of proof is required by the Fourteenth Amendment to the Constitution in a civil proceeding brought under state law to commit an

---

*Ronald M. Soskin* filed a brief for the National Center for Law and the Handicapped as *amicus curiae* urging reversal.

Briefs of *amici curiae* were filed by *William J. Scott,* Attorney General, *Bernard Carey, Alan Grischke,* Special Assistant Attorney General, and *Henry A. Hauser* for the State of Illinois; and by *John Townsend Rich* for the National Assn. for Mental Health et al.

individual involuntarily for an indefinite period to a state mental hospital.

I

On seven occasions between 1969 and 1975, appellant was committed temporarily, Tex. Rev. Civ. Stat. Ann., Arts. 5547–31 to 5547–39 (Vernon 1958 and Supp. 1978–1979), to various Texas state mental hospitals and was committed for indefinite periods, Arts. 5547–40 to 5547–57, to Austin State Hospital on three different occasions. On December 18, 1975, when appellant was arrested on a misdemeanor charge of "assault by threat" against his mother, the county and state mental health authorities therefore were well aware of his history of mental and emotional difficulties.

Appellant's mother filed a petition for his indefinite commitment in accordance with Texas law. The county psychiatric examiner interviewed appellant while in custody and after the interview issued a Certificate of Medical Examination for Mental Illness. In the certificate, the examiner stated his opinion that appellant was "mentally ill and require[d] hospitalization in a mental hospital." Art. 5547–42 (Vernon 1958).

Appellant retained counsel and a trial was held before a jury to determine in accord with the statute:

"(1) whether the proposed patient is mentally ill, and if so

"(2) whether he requires hospitalization in a mental hospital for his own welfare and protection or the protection of others, and if so

"(3) whether he is mentally incompetent." Art. 5547–51 (Vernon 1958).

The trial on these issues extended over six days.

The State offered evidence that appellant suffered from serious delusions, that he often had threatened to injure both of his parents and others, that he had been involved in several

assaultive episodes while hospitalized and that he had caused substantial property damage both at his own apartment and at his parents' home. From these undisputed facts, two psychiatrists, who qualified as experts, expressed opinions that appellant suffered from psychotic schizophrenia and that he had paranoid tendencies. They also expressed medical opinions that appellant was probably dangerous both to himself and to others. They explained that appellant required hospitalization in a closed area to treat his condition because in the past he had refused to attend outpatient treatment programs and had escaped several times from mental hospitals.

Appellant did not contest the factual assertions made by the State's witnesses; indeed, he conceded that he suffered from a mental illness. What appellant attempted to show was that there was no substantial basis for concluding that he was probably dangerous to himself or others.

The trial judge submitted the case to the jury with the instructions in the form of two questions:

> "1. Based on clear, unequivocal and convincing evidence, is Frank O'Neal Addington mentally ill?
>
> "2. Based on clear, unequivocal and convincing evidence, does Frank O'Neal Addington require hospitalization in a mental hospital for his own welfare and protection or the protection of others?"

Appellant objected to these instructions on several grounds, including the trial court's refusal to employ the "beyond a reasonable doubt" standard of proof.

The jury found that appellant was mentally ill and that he required hospitalization for his own or others' welfare. The trial court then entered an order committing appellant as a patient to Austin State Hospital for an indefinite period.

Appellant appealed that order to the Texas Court of Civil Appeals, arguing, among other things, that the standards for commitment violated his substantive due process rights and that any standard of proof for commitment less than that

required for criminal convictions, *i. e.,* beyond a reasonable doubt, violated his procedural due process rights. The Court of Civil Appeals agreed with appellant on the standard-of-proof issue and reversed the judgment of the trial court. Because of its treatment of the standard of proof, that court did not consider any of the other issues raised in the appeal.

On appeal, the Texas Supreme Court reversed the Court of Civil Appeals' decision. 557 S. W. 2d 511. In so holding the Supreme Court relied primarily upon its previous decision in *State* v. *Turner,* 556 S. W. 2d 563 (1977), cert. denied, 435 U. S. 929 (1978).

In *Turner,* the Texas Supreme Court held that a "preponderance of the evidence" standard of proof in a civil commitment proceeding satisfied due process. The court declined to adopt the criminal law standard of "beyond a reasonable doubt" primarily because it questioned whether the State could prove by that exacting standard that a particular person would or would not be dangerous in the future. It also distinguished a civil commitment from a criminal conviction by noting that under Texas law the mentally ill patient has the right to treatment, periodic review of his condition, and immediate release when no longer deemed to be a danger to himself or others. Finally, the *Turner* court rejected the "clear and convincing" evidence standard because under Texas rules of procedure juries could be instructed only under a beyond-a-reasonable-doubt or a preponderance standard of proof.

Reaffirming *Turner,* the Texas Supreme Court in this case concluded that the trial court's instruction to the jury, although not in conformity with the legal requirements, had benefited appellant, and hence the error was harmless. Accordingly, the court reinstated the judgment of the trial court.

We noted probable jurisdiction. 435 U. S. 967. After oral argument it became clear that no challenge to the constitutionality of any Texas statute was presented. Under 28 U. S. C. § 1257 (2) no appeal is authorized; accordingly, con-

struing the papers filed as a petition for a writ of certiorari, we now grant the petition.[1]

## II

The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship,* 397 U. S. 358, 370 (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.

Generally speaking, the evolution of this area of the law has produced across a continuum three standards or levels of proof for different types of cases. At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden of proof is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion.

In a criminal case, on the other hand, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment.[2] In the

---

[1] See *Kulko* v. *California Superior Court,* 436 U. S. 84 (1978); *Hanson* v. *Denckla,* 357 U. S. 235 (1958); *May* v. *Anderson,* 345 U. S. 528 (1953). As in those cases, we continue to refer to the parties as appellant and appellee. See *Kulko* v. *California Superior Court, supra,* at 90 n. 4.

[2] Compare Morano, A Reexamination of the Development of the Reasonable Doubt Rule, 55 B. U. L. Rev. 507 (1975) (reasonable doubt represented a less strict standard than previous common-law rules), with May, Some Rules of Evidence, 10 Am. L. Rev. 642 (1875) (reasonable doubt constituted a stricter rule than previous ones). See generally Underwood, The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases, 86 Yale L. J. 1299 (1977).

administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt. *In re Winship, supra.*

The intermediate standard, which usually employs some combination of the words "clear," "cogent," "unequivocal" and "convincing," is less commonly used, but nonetheless "is no stranger to the civil law." *Woodby* v. *INS,* 385 U. S. 276, 285 (1966). See also C. McCormick, Evidence § 320 (1954); 9 J. Wigmore, Evidence § 2498 (3d ed. 1940). One typical use of the standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof. Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases. See, *e. g., Woodby* v. *INS, supra,* at 285 (deportation); *Chaunt* v. *United States,* 364 U. S. 350, 353 (1960) (denaturalization); *Schneiderman* v. *United States,* 320 U. S. 118, 125, 159 (1943) (denaturalization).

Candor suggests that, to a degree, efforts to analyze what lay jurors understand concerning the differences among these three tests or the nuances of a judge's instructions on the law may well be largely an academic exercise; there are no directly relevant empirical studies.[3] Indeed, the ultimate truth as to how the standards of proof affect decisionmaking may well be

---

[3] There have been some efforts to evaluate the effect of varying standards of proof on jury factfinding, see, *e. g.,* L. S. E. Jury Project, Juries and the Rules of Evidence, 1973 Crim. L. Rev. 208, but we have found no study comparing all three standards of proof to determine how juries, real or mock, apply them.

unknowable, given that factfinding is a process shared by countless thousands of individuals throughout the country. We probably can assume no more than that the difference between a preponderance of the evidence and proof beyond a reasonable doubt probably is better understood than either of them in relation to the intermediate standard of clear and convincing evidence. Nonetheless, even if the particular standard-of-proof catchwords do not always make a great difference in a particular case, adopting a "standard of proof is more than an empty semantic exercise." *Tippett* v. *Maryland*, 436 F. 2d 1153, 1166 (CA4 1971) (Sobeloff, J., concurring in part and dissenting in part), cert. dismissed *sub nom. Murel* v. *Baltimore City Criminal Court*, 407 U. S. 355 (1972). In cases involving individual rights, whether criminal or civil, "[t]he standard of proof [at a minimum] reflects the value society places on individual liberty." 436 F. 2d, at 1166.

### III

In considering what standard should govern in a civil commitment proceeding, we must assess both the extent of the individual's interest in not being involuntarily confined indefinitely and the state's interest in committing the emotionally disturbed under a particular standard of proof. Moreover, we must be mindful that the function of legal process is to minimize the risk of erroneous decisions. See *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976); *Speiser* v. *Randall*, 357 U. S. 513, 525–526 (1958).

### A

This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. See, *e. g., Jackson* v. *Indiana*, 406 U. S. 715 (1972); *Humphrey* v. *Cady*, 405 U. S. 504 (1972); *In re Gault*, 387 U. S. 1 (1967); *Specht* v. *Patterson*, 386 U. S. 605 (1967). Moreover, it is indisputable that involuntary commitment to a mental hospital after a finding

of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomena "stigma" or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual.

The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill. Under the Texas Mental Health Code, however, the State has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others. Since the preponderance standard creates the risk of increasing the number of individuals erroneously committed, it is at least unclear to what extent, if any, the state's interests are furthered by using a preponderance standard in such commitment proceedings.

The expanding concern of society with problems of mental disorders is reflected in the fact that in recent years many states have enacted statutes designed to protect the rights of the mentally ill. However, only one state by statute permits involuntary commitment by a mere preponderance of the evidence, Miss. Code Ann. § 41–21–75 (1978 Supp.), and Texas is the only state where a court has concluded that the preponderance-of-the-evidence standard satisfies due process. We attribute this not to any lack of concern in those states, but rather to a belief that the varying standards tend to produce comparable results. As we noted earlier, however, standards of proof are important for their symbolic meaning as well as for their practical effect.

At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within

a range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement. However, there is the possible risk that a factfinder might decide to commit an individual based solely on a few isolated instances of unusual conduct. Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered.

The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state. We conclude that the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence.

## B

Appellant urges the Court to hold that due process requires use of the criminal law's standard of proof—"beyond a reasonable doubt." He argues that the rationale of the *Winship* holding that the criminal law standard of proof was required in a delinquency proceeding applies with equal force to a civil commitment proceeding.

In *Winship*, against the background of a gradual assimilation of juvenile proceedings into traditional criminal prosecutions, we declined to allow the state's "civil labels and good intentions" to "obviate the need for criminal due process safeguards in juvenile courts." 397 U. S., at 365–366. The Court saw no controlling difference in loss of liberty and stigma between a conviction for an adult and a delinquency adjudication for a juvenile. *Winship* recognized that the basic issue—whether the individual in fact committed a criminal act—was

the same in both proceedings. There being no meaningful distinctions between the two proceedings, we required the state to prove the juvenile's act and intent beyond a reasonable doubt.

There are significant reasons why different standards of proof are called for in civil commitment proceedings as opposed to criminal prosecutions. In a civil commitment state power is not exercised in a punitive sense.[4] Unlike the delinquency proceeding in *Winship,* a civil commitment proceeding can in no sense be equated to a criminal prosecution. Cf. *Woodby* v. *INS,* 385 U. S., at 284–285.

In addition, the "beyond a reasonable doubt" standard historically has been reserved for criminal cases. This unique standard of proof, not prescribed or defined in the Constitution, is regarded as a critical part of the "moral force of the criminal law," *In re Winship,* 397 U. S., at 364, and we should hesitate to apply it too broadly or casually in noncriminal cases. Cf. *ibid.*

The heavy standard applied in criminal cases manifests our concern that the risk of error to the individual must be minimized even at the risk that some who are guilty might go free. *Patterson* v. *New York,* 432 U. S. 197, 208 (1977). The full force of that idea does not apply to a civil commitment. It may be true that an erroneous commitment is sometimes as undesirable as an erroneous conviction, 5 J. Wigmore, Evidence § 1400 (Chadbourn rev. 1974). However, even though an erroneous confinement should be avoided in the first instance, the layers of professional review and observation of the patient's condition, and the concern of family and

---

[4] The State of Texas confines only for the purpose of providing care designed to treat the individual. As the Texas Supreme Court said in *State* v. *Turner,* 556 S. W. 2d 563, 566 (1977):

"The involuntary mental patient is entitled to treatment, to periodic and recurrent review of his mental condition, and to release at such time as he no longer presents a danger to himself or others."

friends generally will provide continuous opportunities for an erroneous commitment to be corrected. Moreover, it is not true that the release of a genuinely mentally ill person is no worse for the individual than the failure to convict the guilty. One who is suffering from a debilitating mental illness and in need of treatment is neither wholly at liberty nor free of stigma. See Chodoff, The Case for Involuntary Hospitalization of the Mentally Ill, 133 Am. J. Psychiatry 496, 498 (1976); Schwartz, Myers, & Astrachan, Psychiatric Labeling and the Rehabilitation of the Mental Patient, 31 Arch. Gen. Psychiatry 329, 334 (1974). It cannot be said, therefore, that it is much better for a mentally ill person to "go free" than for a mentally normal person to be committed.

Finally, the initial inquiry in a civil commitment proceeding is very different from the central issue in either a delinquency proceeding or a criminal prosecution. In the latter cases the basic issue is a straightforward factual question—did the accused commit the act alleged? There may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists. Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous. See *O'Connor* v. *Donaldson,* 422 U. S. 563, 584 (1975) (concurring opinion); *Blocker* v. *United States,* 110 U. S. App. D. C. 41, 48–49, 288 F. 2d 853, 860–861 (1961) (opinion concurring in result). See also *Tippett* v. *Maryland,* 436 F. 2d, at 1165 (Sobeloff, J., concurring in part and dissenting in part); Note, Civil Commitment of the Mentally Ill: Theories and Procedures, 79 Harv. L. Rev. 1288, 1291 (1966); Note, Due Process and the Development of "Criminal" Safeguards

in Civil Commitment Adjudications, 42 Ford. L. Rev. 611, 624 (1974).

The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. The reasonable-doubt standard of criminal law functions in its realm because there the standard is addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a large extent based on medical "impressions" drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient. Within the medical discipline, the traditional standard for "factfinding" is a "reasonable medical certainty." If a trained psychiatrist has difficulty with the categorical "beyond a reasonable doubt" standard, the untrained lay juror—or indeed even a trained judge—who is required to rely upon expert opinion could be forced by the criminal law standard of proof to reject commitment for many patients desperately in need of institutionalized psychiatric care. See *ibid.* Such "freedom" for a mentally ill person would be purchased at a high price.

That practical considerations may limit a constitutionally based burden of proof is demonstrated by the reasonable-doubt standard, which is a compromise between what is possible to prove and what protects the rights of the individual. If the state was required to guarantee error-free convictions, it would be required to prove guilt beyond all doubt. However, "[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person." *Patterson* v. *New York, supra,* at 208. Nor should the state be required to employ a standard of proof that may completely undercut its efforts to further the legitimate interests of both the state and the patient that are served by civil commitments.

That some states have chosen—either legislatively or judi-

cially—to adopt the criminal law standard [5] gives no assurance that the more stringent standard of proof is needed or is even adaptable to the needs of all states. The essence of federalism is that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold. As the substantive standards for civil commitment may vary from state to state, procedures must be allowed to vary so long as they meet the constitutional minimum. See Monahan & Wexler, A Definite Maybe: Proof and Probability in Civil Commitment, 2 Law & Human Behavior 37, 41–42 (1978); Share, The Standard of Proof in Involuntary Civil Commitment Proceedings, 1977 Detroit College L. Rev. 209, 210. We conclude that it is unnecessary to require states to apply the strict, criminal standard.

## C

Having concluded that the preponderance standard falls short of meeting the demands of due process and that the reasonable-doubt standard is not required, we turn to a middle level of burden of proof that strikes a fair balance between the rights of the individual and the legitimate concerns of the state. We note that 20 states, most by statute, employ the standard of "clear and convincing" evidence; [6] 3 states use

---

[5] Haw. Rev. Stat. § 334–60 (b) (4) (I) (Supp. 1978); Idaho Code § 66–329 (i) (Supp. 1978); Kan. Stat. Ann. § 59–2917 (1976); Mont. Rev. Codes Ann. § 38–1305 (7) (Supp. 1977); Okla. Stat., Tit. 43A, § 54.1 (C) (Supp. 1978); Ore. Rev. Stat. § 426.130 (1977); Utah Code Ann. § 64–7–36 (6) (1953); Wis. Stat. § 51.20 (14) (e) (Supp. 1978–1979); *Superintendent of Worcester State Hospital* v. *Hagberg,* 374 Mass. 271, 372 N. E. 2d 242 (1978); *Proctor* v. *Butler,* 117 N. H. 927, 380 A. 2d 673 (1977); *In re Hodges,* 325 A. 2d 605 (D. C. 1974); *Lausche* v. *Commissioner of Public Welfare,* 302 Minn. 65, 225 N. W. 2d 366 (1974), cert. denied, 420 U. S. 993 (1975). See also *In re J. W.,* 44 N. J. Super. 216, 130 A. 2d 64 (App. Div.), cert. denied, 24 N. J. 465, 132 A. 2d 558 (1957); *Denton* v. *Commonwealth,* 383 S. W. 2d 681 (Ky. App. 1964) (dicta).

[6] Ariz. Rev. Stat. Ann. § 36–540 (1974); Colo. Rev. Stat. § 27–10–111 (1) (Supp. 1976); Conn. Gen. Stat. § 17–178 (c) (1979); Del. Code Ann., Tit. 16, § 5010 (2) (Supp. 1978); Ga. Code § 88–501 (u) (1978); Ill. Rev.

"clear, *cogent,* and convincing" evidence;[7] and 2 states require "clear, *unequivocal* and convincing" evidence.[8]

In *Woodby* v. *INS,* 385 U. S. 276 (1966), dealing with deportation, and *Schneiderman* v. *United States,* 320 U. S., at 125, 159, dealing with denaturalization, the Court held that "clear, unequivocal, and convincing" evidence was the appropriate standard of proof. The term "unequivocal," taken by itself, means proof that admits of no doubt,[9] a burden approximating, if not exceeding, that used in criminal cases. The issues in *Schneiderman* and *Woodby* were basically factual and therefore susceptible of objective proof and the consequences to the individual were unusually drastic—loss of citizenship and expulsion from the United States.

We have concluded that the reasonable-doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment. Similarly, we conclude that use of the term "unequivocal" is not constitutionally required, although the states are free to use that standard. To meet due process demands, the standard has to

Stat., ch. 91½, § 3–808 (Supp. 1977); Iowa Code § 229.12 (1979); La. Rev. Stat. Ann. § 28:55E (West Supp. 1979); Me. Rev. Stat. Ann., Tit. 34, § 2334 (5) (A) (1) (1978); Mich. Stat. Ann. § 14.800 (465) (1976); Neb. Rev. Stat. § 83–1035 (1976); N. M. Stat. Ann. § 43–1–11C (1978); N. D. Cent. Code § 25–03.1–19 (1978); Ohio Rev. Code Ann. § 5122.15 (B) (Supp. 1978); Pa. Stat. Ann., Tit. 50, § 7304 (f) (Purdon Supp. 1978–1979); S. C. Code § 44–17–580 (Supp. 1978); S. D. Comp. Laws Ann. § 27A–9–18 (1977); Vt. Stat. Ann., Tit. 18, § 7616 (b) (Supp. 1978); Md. Dept. of Health & Mental Hygiene Reg. 10.21.03G (1973); *In re Beverly,* 342 So. 2d 481 (Fla. 1977).

[7] N. C. Gen. Stat. § 122–58.7 (i) (Supp. 1977); Wash. Rev. Code § 71.05.310 (1976); *State ex rel. Hawks* v. *Lazaro,* 157 W. Va. 417, 202 S. E. 2d 109 (1974).

[8] Ala. Code § 22–52–10 (a) (Supp. 1978); Tenn. Code Ann. § 33–604 (d) (Supp. 1978).

[9] See Webster's Third New International Dictionary 2494 (1961).

inform the factfinder that the proof must be greater than the preponderance-of-the-evidence standard applicable to other categories of civil cases.

We noted earlier that the trial court employed the standard of "clear, unequivocal and convincing" evidence in appellant's commitment hearing before a jury. That instruction was constitutionally adequate. However, determination of the precise burden equal to or greater than the "clear and convincing" standard which we hold is required to meet due process guarantees is a matter of state law which we leave to the Texas Supreme Court.[10] Accordingly, we remand the case for further proceedings not inconsistent with this opinion.

*Vacated and remanded.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

---

[10] We noted earlier the court's holding on harmless error. See *supra,* at 422.