213 N.J. Super. 243 (1986)
517 A.2d 146
IN THE MATTER OF THE COMMITMENT OF B.S.
Superior Court of New Jersey, Appellate Division.
Submitted September 8, 1986.
Decided September 30, 1986.
*244 Before Judges MORTON I. GREENBERG, J.H. COLEMAN and COHEN.
Gross & Novak, attorneys for appellant, Robert Wood Johnson University Hospital (William P. Isele, on the brief).
*245 W. Cary Edwards, Attorney General, attorney for respondent Division of Mental Health and Hospitals (Michael R. Clancy, Deputy Attorney General, of counsel; Carol L. Widemon, Deputy Attorney General, on the brief).
No brief was filed on behalf of respondents Middlesex County, B.S. and Arlene Reiter, court-appointed guardian for B.S.
The opinion of the court was delivered by COHEN, J.A.D.
B.S. has been a patient at Robert Wood Johnson University Hospital ("University Hospital") since July 1984. University Hospital applied for the involuntary commitment of B.S. pursuant to N.J.S.A. 30:4-25 et seq. and R. 4:74-7.[1] The Chancery Division held that even though B.S. suffered from mental illness, she was not shown to be dangerous to herself or others or property and therefore she was not a proper subject for commitment to a psychiatric hospital. University Hospital appealed in its own name,[2] and we now reverse.
Before she was admitted to University Hospital, B.S. had a lengthy history of mental illness. Since 1971, she had multiple admissions to psychiatric hospitals and periods of out-patient care. In 1982 she was diagnosed at Marlboro Psychiatric Hospital as a schizophrenic, with delusions and hallucinations.
B.S. now suffers from organic brain damage, resulting partly from early drug abuse, partly from a period of hypoxia occurring during a hospital procedure, and partly from acquired immune deficiency syndrome, or AIDS. It is uncertain if her schizophrenia continues, according to one witness, because she no longer communicates sufficiently to permit such a diagnosis. Another witness found no evidence of the hostility or suspicion *246 that he expected to find in a schizophrenic. B.S., according to Dr. Edward McGough, Professor at Rutgers Medical School and Chief of Psychiatric Services at University Hospital, is a serious management problem, whose behavior is restricted by a male guard, physical restraints, and "very high" doses of thorazine. Without the medication and restraints, Dr. McGough says, B.S. is hyperactive, "a bit of a menace" to patients and staff, and impossible to control. She is at times combative. There have been incidents of B.S.'s hitting and biting nurses, wandering the corridors and getting into bed with other patients. She cannot manage independently, and, according to Dr. McGough and a psychiatric resident who also testified, is dangerous to herself and others and needs to be put in a closed psychiatric unit. Her prognosis is unfavorable.
In addition to her mental problems, B.S. has had a series of physical disorders including AIDS and related endocarditis, tuberculosis, hepatitis, blood disorders and a bleeding skin condition. Beyond question, the AIDS-related problems heightened University Hospital's concern over B.S.'s presence and the dangers posed by her interaction with patients and staff.
For many months prior to the Chancery Division hearing, the Division of Mental Health, Department of Human Services, attempted to place B.S. in a nursing home or other facility capable of dealing with her mental and physical problems. Because the Division was working optimistically toward that end, University Hospital withheld its application for commitment. The Division's placement efforts failed, as did the continuing parallel efforts of the hospital's social service staff. Further, the psychiatric hospitals operated by the State are apparently not equipped to deal with a person presenting B.S.'s constellation of ills.
The Division opposed the application for commitment. It produced the testimony of Dr. Michael Rotov, the Division's Chief Psychiatrist. He found B.S. to be manageable under medication at University Hospital and becoming more so. He *247 believed she would be best placed in a nursing home equipped and willing to take her, but conceded that none had been found. He agreed with Dr. McGough that B.S. suffered from organic brain damage, but found no psychosis. He felt the constant restraints and lack of privacy caused B.S.'s behavioral problems, and recommended a reduction in the heavy administration of thorazine.
Dr. Rotov said that even though B.S. cannot take care of herself and requires "a structured setting," she is not a danger to herself or others. His medico-legal thesis was:
... she is not suicidal. This is usually meant when it's required for commitment to a State Hospital, dangerous to herself is meant suicidal or homicidal. The lack of ability for self care is something else and that's what she has.
Dr. Rotov also said that B.S.'s bleeding skin condition would pose a danger to others if she were not restrained from contact with others. She does not appreciate her AIDS condition and the danger it creates, but that is not the kind of danger, Dr. Rotov opined, which the law contemplates.
After the hearing, the hospital attempted to reduce B.S.'s thorazine dose, as recommended by Dr. Rotov. According to counsel's representation, which was not questioned by the Division, the daily dose was reduced from 1,000 to 800 milligrams. The next day, out of restraints to go to the shower, B.S. attempted to choke a nurse, bit and kicked a security guard and was finally subdued by eight persons. The dosage was immediately restored to its former level.
The trial court understandably agonized over its decision. In an oral opinion, delivered on February 26, it noted that the last assaultive behavior was in December 1985 and there is "no evidence of any recent episodes." The court concluded that B.S. "is not capable of caring for herself" but it was not satisfied that she was a danger to herself. The court further noted that although the hospital "couldn't take the restraints off her and take the guard away from her," it had not tried to deal with her in alternative ways. On that basis the court declined to commit B.S. but ordered the hospital and the Division *248 to "make every effort to place" her "in an appropriate setting, such as a nursing home" by April 10, 1986. In default of such placement, the court said, it would transfer custody of B.S. to the Division without institutionalization.
The matter resumed on March 26. Counsel for the hospital told the court of the incident occurring after B.S.'s medication was lessened. The Division and the hospital both reported continued failure to place her in any facility. The court then rescinded its earlier order relating to custody of B.S.
To order the involuntary civil commitment of a person for mental illness, the court must be satisfied by clear and convincing evidence that the person is dangerous to self or others or society if not confined and treated. R. 4:74-7; Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); State v. Krol, 68 N.J. 236 (1975). It is not appropriate to evaluate the person as he or she appears currently under heavy medication and restraint, and to determine that commitment is not warranted because the person may be managed in such draconian circumstances. This is especially so where the current setting is, as the trial court found here, more restrictive of the person's freedom than if commitment were ordered.
A general hospital is not required to continue maintenance of a mentally ill person who meets Krol standards simply because it has found means of sedating and restraining the person and the Division of Mental Health might not be able to find more appropriate means of managing the case.
Dr. Rotov's opinion that commitment was unwarranted arose out of his fundamentally flawed view that only suicidal or homicidal patients may legally be involuntarily hospitalized. The Chancery Division accepted the hospital's account of B.S.'s behavior, and agreed both that she is not capable of caring for herself, and also that it is necessary to restrain and guard her to prevent harm to others. There was no other way suggested by the evidence to deal with this concededly mentally ill person. *249 Her care is expensive, her presence in a general hospital disquieting and disruptive, and both University Hospital and the Division of Mental Health are without resources appropriate to deal with her.
We need not deal with the vexing question whether a mentally ill person should be committed because of her inability to appreciate the dangers to which an AIDS condition exposes others, thereby creating perils through otherwise non-dangerous conduct. We need not do so because B.S. qualifies for commitment without regard to that problem. She is unable to care for herself as the result of her mental condition. She is also hyperactive unless medicated and likely to injure others through aggressive and combative conduct. Such conduct is especially intolerable in a hospital full of people weakened by illness or the effects of surgery, and where the only available management techniques are more intrusive than might be employed in a psychiatric hospital.
There can be no question, apart from the complicating AIDS problem, that, if B.S. were to remain at large in the general population without some restraints, she would pose a danger to herself and others, Krol, 68 N.J. at 257. There would be a substantial risk of serious harm within the reasonably foreseeable future. Krol, 68 N.J. at 259-260.
The focus of judicial concern with commitment of the mentally ill is the protection of their individual liberties against inappropriate intrusion. Realism requires a recognition that B.S.'s future holds little opportunity to exercise individual liberties, whatever our disposition of this matter. The real dispute is between a general hospital and a government agency both of whom seek to avoid the burden of caring for B.S. We decide no more today, however, than that B.S. is a proper subject for commitment.
We are loathe to second-guess a trial court either in its factfindings, Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974), or in its appropriate balancing of societal *250 interests and individual liberties in commitment cases. Matter of Commitment of J.L.J., 196 N.J. Super. 34, 49 (App.Div. 1984). Here, however, the judgment in a terribly difficult matter followed the basically flawed opinion of the Division's Chief Psychiatrist and thus the court was led to misapply the applicable law.
The matter is reversed and remanded to the trial court for the entry there of a judgment of involuntary commitment. Perhaps such an order will create the need for suitable further proceedings if the Division is unable to remove B.S. from University Hospital. Those proceedings will take place in the Chancery Division. Jurisdiction is not retained.
NOTES
[1] The application was executed by B.S.'s mother, at the hospital's instance, but the hospital prosecuted it, provided counsel and witnesses and plainly had the principal stake in the outcome.
[2] The Attorney-General raises no objection to this procedure.