|,WOODARD, Judge.
The mover, FBSR, appeals the trial court’s continuation of his judicial commitment and denial of his petition for a writ of habeas corpus, seeking to be released from nursing home confinement which was based on mental illness. For the reasons below, we reverse.
FACTS
Pursuant to a physician’s emergency certificate on January 1, 1997, FBSR a seventy-six-year-old retired physician, was admitted to the Rapides General Hospital Geriatric Psychiatric Unit in Alexandria, Louisiana. A coroner’s emergency certificate was filed the next day, and on January 16, 1997, Dr. Winston O’Quin, the program manager of the Rapides General Hospital Geriatric Psychiatric Unit, filed a petition for FBSR’s judicial commitment. The hearing date was set on February 3, 1997, but was continued to February 10, 1997, at which time the trial court committed FBSR, based on his mental illness, to a nursing home of his family’s choice. FBSR was then transferred to the Matthews Memorial Nursing Home.
^Thereafter, FBSR filed a petition for a writ of habeas corpus, contending that he was no longer, if he ever was, a “mentally ill person,” “dangerous to others,” “dangerous to self’ or “gravely disabled,” within the definitions set out, respectively, in La.R.S. 28:2(14), La.R.S. 28:2(3), La.R.S. 28:2(4) and La.R.S.28:2(10). The habeas corpus hearing was originally set for July 7, 1997, but was continued to July 14, 1997. The court held that there was no change in circumstances warranting his release from commitment. An order was signed to that effect on July 28,1997, and FBSR appealed from that judgment on July 30,1997.
LAW
On appeal, FBSR argues that based on the following language in the trial court’s July 28, 1997 order of continuing judicial commitment, the court applied the wrong standard of proof in denying his writ of habeas corpus to be released from the nursing home:
The Court, after hearing testimony and receiving evidence including the report of the Matthews Memorial Nursing Home dated May 9,1997 and being of the opinion for the reasons this day orally assigned, that the welfare of the defendant would be best served by continuing his commitment to a nursing home of his family’s choice_
(Emphasis added.) According to FBSR, the correct inquiry is not the “best interest of the defendant” test, but whether the evidence clearly and convincingly shows that he is dangerous to himself, dangerous to others, or is gravely disabled as a result of substance abuse or mental illness.
We agree that this is the proper standard of proof. Specifically, according to La. R.S. 28:55(E)(1), it must be shown by clear and convincing evidence that the individual is dangerous to himself or to others or is gravely disabled “as a result of substance abuse or mental illness_” (Emphasis added.) Although the trial court’s factual findings, for purposes of judicial commitment, are afforded great weight and should not be disturbed in the absence of manifest error according to In re Commitment of W.C., 96-0777 (La.App. 1 Cir. 12/20/96); 685 So.2d 634, “the record must be reviewed in light of the high standards enunciated by statute since the judgment of the trial court involves deprivation of liberty by involuntary commitment.” Judicial |3Commitment of J.M., 560 So.2d 100, 103 (La.App. 3 Cir.1990), citing Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).
We also agree with FBSR that at no time did the court determine whether the mental illness caused him to be a danger to himself, a danger to others, or caused him to be gravely disabled, thus, erring as a matter of law. Absent, proof of one of the three statutory grounds for commitment under the mental health law, FBSR cannot be judicially *678 committed. In re H.W., 94-0406 (La.App. 4 Cir. 9/29/94); 644 So.2d 225. We, therefore, conduct a de novo review to determine whether the evidence was sufficient to support the continuation of FBSR’s judicial commitment.
Mental Illness/Substance Abuse
The procedure for judicial commitment, according to La.R.S. 28:54(A), is as follows:
Any person of legal age may file with the court a petition which asserts his belief that a person is suffering from mental illness which contributes or causes that person to be a danger to himself or others or to be gravely disabled, or is suffering from substance abuse which contributes or causes that person to be a danger to himself or others or to be 'gravely disabled and may thereby request a hearing.
(Emphasis added.)
We first consider whether FBSR suffers from either a mental illness or substance abuse. The trial court’s February 10, 1997 order committing FBSR stated that “IT IS ORDERED, ADJUDGED AND DECREED that the Defendant is and is hereby declared to be suffering from a mental illness within the meaning of Louisiana Revised Statutes, Title 28.... ” In making its initial judicial commitment determination, the trial court relied on a physician’s report to the court and three other physician 'consultation reports. According to the physician’s report to the court, FBSR was described as “[v]ery agitated, angry, unpredictable and confused!),]” thinks it “is 1969 and does not know whether he has any children or not” and “[bjelieves he can drive a car and cook and take care of self.” In addition, FBSR was described as “confused, disoriented and delusional with periods of agitation and combativeness” in one of the three consultation reports that the court relied on in its initial judicial. commitment. These reports were made approximately six months prior to the instant-hearing. Dr. Gregory Brian, FBSR’s son and treating physician, admitted that his father has improved since he has been at the nursing home. Accordingly, those reports appear to be somewhat outdated.
According to La.R.S. 28:2(14), a “[mjentally ill person” is “any person with a psychiatric disorder which has substantial adverse effects on his ability to function and who requires care and treatment. It does not refer to a person suffering solely from mental retardation, epilepsy, alcoholism, or drug abuse.” (Emphasis added.) Although Dr. Brian diagnosed FBSR with alcoholic dementia, his testimony reveals that his overriding concern is that of FBSR’s alcoholism, and not that of any mental instability. For example, when asked what FBSR’s treatment was for “the condition for which he was committed!),]” Dr. Brian responded, “Absence of alcohol and a structured environment.” Additionally, when asked what his father’s illness was, Dr. Brian answered, “He has alcohol induced dementia and he has severe alcoholism and he also has alcoholic polyneuropathy_” Further, when asked how FBSR would pose a danger to himself, he mentioned only his alcohol consumption, his mismanagement of money and his gambling problem. Thus, it appears that Dr. Brian’s concerns for FBSR would not be manifested in the absence of alcohol.
Further doubt is cast on the trial court’s finding of a mental illness based on the nursing home’s medical records, which include a pre-screening form dated February 4, 1997. One of the questions on that form asks whether the patient has “a diagnosis of a mental disorder that is: schizophrenia, serious mood disorder, paranoia, panic or other severe anxiety disorder, somatoform disorder, personality disorder, other psychotic disorder, or another mental disorder that may lead to a chronic disability!).]” Although that question was answered affirmatively, there is a blank space next to the order to “List Diagnosis!).]”
We must also note that no other family members or acquaintances of FBSR, other than his son who had committed him, or physicians or psychiatrists were asked to come forward at the hearings to substantiate any symptoms of mental illness that FBSR may have displayed prior to his commitment or current to the latest hearing.
*679 Even if a mental illness were initially present, we cannot say that FBSR continued to suffer from it, as the trial court so held in its July 28, 1997 order of continuing commitment. The language in that order reads as follows: “treatment is continued to include medication or any psychiatric treatment necessary for the duration of his mental illness or until he is discharged or conditionally discharged-’’^Interestingly, the nurses’ progress notes of February 17, 1997, written just days after FBSR was declared to suffer from a mental illness, indicate that upon admission to the nursing home, FBSR was “[a]lert, oriented. Friendly, cooperative [with] questions asked upon admission.” In addition, the nursing home’s March 1997. admission assessment failed to note any of the listed “INDICATORS OF DELIRIUM[.]” The nursing home’s February, March, April, May, and June 1997 monthly summary reports note that FBSR’s mental status is confused, yet alert. Furthermore, according to the nursing home’s May 1997 quarterly assessment form, there were, again, none of the listed “INDICATORS OF DELIRIUM[.]” Consequently, there is insufficient evidence in the record to substantiate the trial court’s finding that FBSR suffered from a mental illness that warrants judicial commitment.
In order for FBSR to have a condition of “[s]ubstanee abuse,” , he would have to use “narcotic, stimulant, depressant, soporific, tranquilizing, or hallucinogenic drugs or alcohol to the extent that it renders [him] dangerous to himself or others or renders [him] gravely disabled.” La.R.S. 28:2(26) (emphasis added). There is evidence as to FBSR’s severe alcoholism. According to his accumulative diagnosis record of February 17, 1997, he was diagnosed with alcoholic dementia, severe alcoholism and alcoholic polyneuropa-thy. However, we must determine whether FBSR’s alcoholism rises to a level that warrants judicial commitment; that is, whether that substance abuse “contributes or causes [him] to be a danger to himself or others or to be gravely disabled....” La.R.S. 28:54(A) (emphasis added).
“DANGER TO SELF”
According to La.R.S. 28:2(4), “[dangerous to self’ means “the condition of a person whose behavior, significant threats or inaction supports a reasonable expectation that there is a substantial risk that he will inflict physical or severe emotional harm upon his own person.” (Emphasis added.) It is important to remember that in order for FBSR to-be judicially committed, he would have to be a danger to himself as a direct result of alcohol abuse. We note at the onset that based on our review of the law, there is no Louisiana case which holds that alcohol abuse, per se, makes an individual dangerous to him or herself. In fact, the nursing home’s appellate brief fails to cite any law that would lead us to that conclusion.
|6Pr. Brian’s main reason for having FBSR judicially committed is based on his belief that his father lacks clear judgment to make decisions on what is safe for himself. Examples he raised include claims that FBSR mismanaged money and that he had a gambling problem. The record not only fails to sufficiently establish the existence of those problems, but also fails to suggest how these examples, in any way, would constitute “dangerous to self’ within the statutory definition. These are lifestyle choices which may lead to undesirable consequences. However, again, we fail to understand how they meet the legal requirement for depriving a person of his liberty. As in State v. AC., 543 So.2d . 133, 136 (La.App. 2 Cir.1989), in the absence of any indication that an individual “physically or emotionally harmed himself[,]” the evidence before us “does not permit a finding of ‘dangerous to self.’ ” This finding is consistent with the United States Supreme Court’s admonition against the risk of committing an individual “based solely on a few isolated instances of unusual conduct.” Addington, 441 U.S. at 427, 99 S.Ct. 1804. As aptly put by the United States Supreme Court:
At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.... Loss of liberty calls for a showing that the individ *680 ual suffers from something more serious than is demonstrated by idiosyncratic behavior.
Id. at 426-27, 99 S.Ct. 1804.
We also note that FBSR was able to hire his own counsel, coherently answer questions put to him at trial, as well as respond to current affair questions at trial. Thus, given the speculative nature of the arguments in favor of. judicial commitment, there is no clear and convincing evidence that FBSR is “dangerous to [himjself” due to substance abuse.
“DANGER TO OTHERS”
According to La.R.S. 28:2(3), “[d]an-gerous to others” involves “the condition of a person whose behavior or significant threats support a reasonable expectation that there is a substantial risk that he will inflict physical harm upon another person in the near future.”
RThe only evidence before us on this issue are references to FBSR’s attempted assault on his sitters, which led to his rehospitalization, and his shouting of vulgar language on June 5, 1997 toward staff at the nurses station. This can hardly serve as clear and convincing evidence that FBSR is dangerous to others. Our review of the record indicates that he could not be reasonably expected to pose as a danger to other individuals. In fact, the nursing home records indicate that he often socialized with other patients. When Margaret Holston, the director of nursing who was in daily contact with FBSR since his admission in February 1997, was asked at trial if “he ever became combative when nursing personnel attempted to give him ... the prescribed medicine[,]” she responded, “Just in his voice, statement, you know.” To be fair, relevant, and realistic, it must be acknowledged that this man was forcibly taken to a place he did not want to be and is being kept there against his will. Of course, he is going to have anger and resentment. Additionally, when Dr. Brian was asked if his father posed “any threat or danger to other people!,]” he responded “Uh. Not directly. Indirectly, if he were to decide he could drive or that sort of thing, he would be a threat to others.” The possibility of whether FBSR presented a danger to others does not meet the test espoused in In re H.W., 94-0406 (La.App. 4 Cir. 9/29/94); 644 So.2d 225, 228, which is that it be “highly probable, that is, much more probable than not.” (Citation omitted.) Therefore, we hold that FBSR is not “dangerous to others.” “Grave” Disability
Regarding the meaning of “gravely disabled,” La.R.S. 28:2(10) provides as follows:
“Gravely disabled” means the condition of a person who is unable to provide for his own basic physical needs, such as 'essential food, clothing, medical care, and shelter, as a result of serious mental illness or substance abuse and is unable to survive safely in freedom or protect himself from serious harm; the term also includes incapacitation by alcohol, which means the condition of a person who, as a result of the use of alcohol, is unconscious or whose judgment is otherwise so impaired that he is incapable of realizing and making a rational decision with respect to his need for treatment.
(Emphasis added.) According to In re H.W., 644 So.2d at 228, “[t]he statute clearly requires that both elements be proven ....” to establish grave disability for purposes of judicial commitment.
IgA. Is FBSR able to care for himself?
There is ample evidence in the record to establish that FBSR is able to take care of himself. According to the nursing home’s May 1997 quarterly assessment form, FBSR was declared “independent” as to the following activities: bed mobility, transfer between surfaces, walking between locations in room, self-sufficiency in wheelchair, eating, toilet use, and personal hygiene. Dr. Brian confirmed at trial that he is able to dress himself “partially!,]” “eats pretty good” but “refuses his medications on occasion.” Christopher Anglin, a social worker at the nursing home, confirmed that “[w]ith a lot of encouragement, sometimes” FBSR would take care of himself.
Moreover, FBSR’s refusal to take certain medication at times is not a product of his alcohol abuse. According to Dr. Brian, *681 FBSR disliked the fluid medications “because it makes him go to the bathroom” and he refused the vitamin B-12 shots on occasion “because he doesn’t like the shot.” This defeats La.R.S. 28:2(10)’s requirement that alcoholism be the reason that FBSR is “unable to provide for his own basic physical needs.” According to Margaret Holston, the director of nursing, FBSR actually refused the medicines “on an average, maybe, two, three, four times a month....” As far as FBSR’s alleged refusal to bathe at times, FBSR testified that nursing personnel were not always aware that he 'took baths since he often chose to. bathe in his own bathroom because he disliked bathing elsewhere due to sanitation concerns; namely, he spoke of fecal matter present in the bathing area. Therefore, there is no requisite causal nexus between FBSR’s alcohol abuse and his refusal to meet certain basic needs.
B. Can FBSR protect himself from serious harm?
After reviewing the record, we also conclude that FBSR can protect himself from serious harm. According to the nursing home’s March 1997 admission assessment form, in “Expressing information content[,]” FBSR made. himself “understood” and in “[u]derstanding. verbal information content[,]” he was able to “understand” others. Dr. Brian indicated in his April 9,1997 physician’s progress notes that there was “overall much improv[ement] since admission” and Denise Cope, the assistant administrator of the nursing home, acknowledged in her written May 9, 1997 judicial commitment review to the trial court that “his condition has improved....” Further, the nursing home’s May 1997 quarterly assessment form indicates that bon a scale of “independent” to “severely impaired,” FBSR’s cognitive skills for daily decision making is only “moderately impaired.” Dr. Brian also admitted at the July 1997 habeas hearing that his father is “now capable of recognizing his family.” He believes that his father would not be safe only as it relates to “judgment calls of his everyday living processes.” Furthermore, the episodes that Dr. Brian referred to, ad-mittingly, predated the February 1997 commitment. Thus, taken as a whole, the circumstances' do not clearly and convincingly support a finding that FBSR’s disability is grave, rendering him able to survive safely in freedom without serious harm.
Further, had alcoholism been the true reason for his confinement, then FBSR should have received, rehabilitative treatment which includes more than just the “[ajbsence of alcohol and a structured environment.” Moreover, judicial commitment for alcoholism would have entitled FBSR to be released according to the time specified in La.R.S. 28:56:
A commitment for alcoholism shall expire after forty-five days, and the patient, if not converted to a voluntary status, shall be discharged, unless the court, upon application by the director of the treatment facility, finds that continued involuntary treatment is necessary and orders that patient recommitted for a period not to exceed sixty days; provided, that not more than two such sixty day recommitments may be ordered in connection with the same continuous confinement.
(Emphasis added.). Thus, the total number of days that FBSR could have been confined for alcoholism is 165 days (45 days plus the maximum additional time of 120 -days). Further, according to mental health law, “any involuntary treatment or evaluation [is to] be accomplished in a setting which is medically appropriate, most likely to facilitate proper care and treatment that will return the patient to the community as soon as possible, and is* the least restrictive of the patient’s liberty.” La.R.S. 28:50(2).
Thus, because the evidence adduced at the commitment hearing failed to clearly and convincingly satisfy the pertinent statutory grounds for commitment, the trial court was clearly wrong in denying FBSR’s request for a writ of habeas corpus.
11 nCONCLUSION
Based on the foregoing, we reverse the trial court’s continuance of FBSR’s commitment and order that he be released from the nursing home. Costs of this appeal are assessed to the nursing home.
REVERSED.
DOUCET C.J., dissents and assigns written reasons.