**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 15-6003**

_____

UNITED STATES OF AMERICA,

             Petitioner - Appellee,

        v.

PABLO RAMIREZ-ALANIZ,

             Respondent - Appellant.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  W. Earl Britt, Senior District Judge.  (5:14-hc-02159-BR)

_____

Argued:  December 9, 2015            Decided:  January 26, 2016

_____

Before NIEMEYER, DUNCAN, and AGEE, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Niemeyer wrote the opinion, in which Judge Duncan and Judge Agee joined.

_____

**ARGUED:** Joseph Bart Gilbert, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Robert J. Dodson, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Jennifer D. Dannels, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

The district court committed Pablo Ramirez-Alaniz, a Mexican national who had been charged with illegally reentering the United States following deportation, to the custody and care of the Attorney General pursuant to 18 U.S.C. § 4246. The court found that Ramirez-Alaniz, who was being detained at the Federal Medical Center in Butner, North Carolina ("FMC Butner"), for a mental health evaluation following his illegal reentry, was "suffering from a mental disease or defect as a result of which his release [-- whether in the United States or Mexico --] would create a substantial risk of bodily injury to another person or serious damage to the property of another."

Ramirez-Alaniz now challenges this civil commitment order, arguing that because he would be deported to Mexico if released, the district court's finding of risk of danger to other persons or property would apply to persons and property in Mexico, giving improper extraterritorial effect to § 4246. He notes that "the dangerousness prong [of § 4246] applies [solely] to effects <u>within the United States</u>, because the legislation fails to clearly indicate that Congress intended extraterritorial application." (Emphasis added).

We conclude, however, that because the district court found that Ramirez-Alaniz's release would also pose a risk of danger to persons or property <u>in the United States</u>, we need not reach

3

whether § 4246 applies extraterritorially. Accordingly, we affirm, albeit on reasoning different from that given by the district court.

I

In January 2011, after Ramirez-Alaniz pleaded guilty in Oregon to charges relating to discharging a firearm in his apartment, pointing the firearm at another individual, and resisting arrest, an Oregon state court sentenced him to 30 months' imprisonment. During his incarceration, he was given medication for mental health issues. Thereafter, he was deported to Mexico and prohibited from reentering the United States.

About two weeks later, however, on December 6, 2012, Ramirez-Alaniz was detained by border patrol agents in Arizona and charged with illegal reentry following deportation, in violation of 8 U.S.C. § 1326(b)(2). While detained, Ramirez-Alaniz exhibited poor institutional adjustment, sexually inappropriate behavior, and noncompliance with the administration of medication. As these conditions escalated, a staff psychiatrist recommended his transfer to an inpatient psychiatric hospital. The district court in Arizona ordered that Ramirez-Alaniz be evaluated for competency restoration and treatment under 18 U.S.C. § 4241 and, if he could not be

restored to competency, that Ramirez-Alaniz remain hospitalized and undergo a dangerousness evaluation, pursuant to 18 U.S.C. §§ 4246 and 4248. Accordingly, Ramirez-Alaniz was transferred to FMC Butner for evaluation and treatment.

A panel of mental health evaluators at FMC Butner determined that Ramirez-Alaniz was incapable of proceeding with the pending criminal case in the District of Arizona and that his competency was unlikely to be restored in the foreseeable future due to cognitive limitations. In a subsequent forensic evaluation completed in June 2014, the FMC Butner medical staff concluded that Ramirez-Alaniz was suffering from "a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of others."

On receipt of this forensic evaluation, the government initiated the present proceeding by filing a Certificate of Mental Disease or Defect and Dangerousness in the Eastern District of North Carolina on July 22, 2014, see 18 U.S.C. § 4246(a), and the district court thereafter conducted a commitment hearing. During the hearing, the court considered forensic reports and testimony from Dr. Carlton Pyant, a staff psychologist at FMC Butner, and Dr. Katayoun Tabrizi, a psychiatrist appointed by the court, both of whom had evaluated Ramirez-Alaniz.

5

Dr. Pyant diagnosed Ramirez-Alaniz as suffering from schizophrenia, an unspecified neurodevelopmental disorder, and an alcohol use disorder. Dr. Pyant noted that prior to receiving treatment at FMC Butner, Ramirez-Alaniz had shown "poor impulse control"; he was "sexually provocative and dangerous"; "his speech was disorganized"; "his judgment [was] poor"; he was "hearing voices"; he engaged in significant substance abuse; and he was "essentially unable to control himself." Dr. Pyant reported, however, that Ramirez-Alaniz had been compliant with the administration of medication in the structured environment of FMC Butner and, with medication, had demonstrated "some insight into his behavior." For example, Ramirez-Alaniz told Dr. Pyant that the medication had helped to "stop the voices" and prevent "sexual thoughts." Dr. Pyant also noted that, with medication, Ramirez-Alaniz had been respectful of the rights of others, had a positive attitude, and was cooperative with staff. Nonetheless, Dr. Pyant was of the opinion that Ramirez-Alaniz would not continue with his medications if released because he had made statements to that effect and because he had "minimal to no social support" in the United States to provide necessary "ongoing supervision to ensure medication compliance." Dr. Pyant also noted that Ramirez-Alaniz was unable to provide a realistic plan "to locate appropriate aftercare resources." Accordingly, he concluded

6

that Ramirez-Alaniz, if released, would pose a substantial risk of bodily injury to other persons or serious damage to the property of other persons.

Similarly, Dr. Tabrizi diagnosed Ramirez-Alaniz with schizophrenia, an alcohol use disorder, and a cocaine use disorder. She also made a provisional diagnosis of an intellectual disability. She noted indicia of cognitive delays, such as observations that Ramirez-Alaniz was unable to recall a total of three words after the passing of five minutes, that he could not state the current month, and that he could not perform simple arithmetic. She also noted several factors that increased Ramirez-Alaniz's risk for future violence, including a psychotic mental health illness; a history of firearm possession, resisting arrest, drug use, and alcohol addiction; and social obstacles, including unemployment and lack of social support in the United States. She emphasized, however, that Ramirez-Alaniz had only one documented episode of dangerous behavior in the five years during which he lived in the United States and that he had responded well to medication. She noted that, with medication, Ramirez-Alaniz was respectful, cooperative, and had a good sense of humor when she interviewed him. Ultimately, Dr. Tabrizi concluded that Ramirez-Alaniz's "release back to Arizona for deportation would not create a substantial risk of bodily injury or damage to the property of

7

another in the United States," but this conclusion was based primarily on her assumption that Ramirez-Alaniz would be deported to Mexico and, pending deportation, would remain in custody. While Dr. Tabrizi recognized that Ramirez-Alaniz might try to reenter the United States after deportation, she discounted this risk because of "the uncertainty about the likelihood of" his reentry. She recognized, however, that if Ramirez-Alaniz were to be released into a "community in the United States on his own," a problem would exist with "his being able to access mental health treatment and get his medications." Accordingly, she agreed that in that circumstance, Ramirez-Alaniz would meet the criteria for civil commitment under § 4246.

At the hearing, Ramirez-Alaniz also testified. He expressed his willingness to receive medication to treat his mental illness and stated, in view of his potential deportation, that he wished to return to Mexico "as soon as possible." He "promised" that, if deported, he would not return to the United States without permission.

In argument to the district court, counsel for Ramirez-Alaniz stated his firm conviction that, if released, Ramirez-Alaniz would be deported to Mexico "forthwith," noting that it would be "preposterous" to assume that the government would not deport him inasmuch as he is "exactly the kind of person who

8

will be processed for deportation." Consequently, counsel argued that Ramirez-Alaniz would not pose a risk to persons or property in the United States. The government argued, however, that immediate deportation was not a sure thing, as no Immigration and Customs Enforcement detainer was then pending. After receiving supplemental briefing on whether the reach of § 4246 should be limited to persons and property in the United States, the district court concluded that § 4246 means "that a person should be civilly committed if he suffers from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person, regardless of their citizenship or geographic location." (Emphasis added). The court then found, by clear and convincing evidence, that "[w]hether [Ramirez-Alaniz] is released in the United States or his native Mexico, his release would pose a high risk of dangerousness given his psychotic disorder and cognitive deficits." (Emphasis added). Accordingly, the court ordered that Ramirez-Alaniz be committed to the custody and care of the Attorney General.

Following the district court's commitment order, the district court in Arizona dismissed the criminal indictment against Ramirez-Alaniz. Therefore, following the commitment order, no detainer, criminal proceeding, or deportation

proceeding was -- nor currently is -- pending against Ramirez-Alaniz.

From the district court's civil commitment order, Ramirez-Alaniz filed this appeal, contending that § 4246 is not implicated by his circumstances because, if released, he would be immediately deported to Mexico and § 4246 applies only to protect persons and property in the United States. He argues that the district court erred in construing § 4246 to include any risk to persons or property in Mexico.

II

Section 4246 of Title 18 provides that when the director of a hospital facility "certifies" that a person in the custody of the Bureau of Prisons or the Attorney General "suffer[s] from a mental disease or defect" that would pose a "substantial risk" of bodily injury to persons or serious damage to property, he must, in the absence of suitable arrangements for state custody, file the certificate in the district court where the person is in custody, thus commencing a civil commitment proceeding. 18 U.S.C. § 4246(a). Upon notice to the person and the government, the district court must then conduct a hearing to determine the risk of the person's danger to other persons and property. Id. § 4246(a), (c). If the court finds "by clear and convincing evidence that the person is presently suffering from a mental

10

disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another," the court must commit the person to the custody of the Attorney General. Id. § 4246(d).

In this case, Ramirez-Alaniz does not challenge the district court's finding that he would pose a substantial risk of bodily injury to another person or serious damage to another's property. Rather, he argues that § 4246 should not be applied to commit him because he will be deported to Mexico and the risk which the court found will be relevant only to persons and property in Mexico, not to persons or property in the United States. Consequently, he reasons, the district court, in finding that Ramirez-Alaniz posed a risk of dangerousness whether he is "released in the United States <u>or his native Mexico</u>," erred in construing § 4246 to cover effects in Mexico. (Emphasis added). Stated otherwise, Ramirez-Alaniz argues that the district court erred when it applied § 4246 to persons and property "anywhere in the world," thus failing to recognize the general presumption against the extraterritorial application of statutes absent a clear congressional expression of such application.

The government argues that even if Ramirez-Alaniz is promptly deported, § 4246 "provides for civil commitment regardless of the at-risk person's citizenship or geographical

11

location." It also argues that Ramirez-Alaniz's deportation is not certain and that, if released, Ramirez-Alaniz would pose a risk to persons and property in the United States. Finally, the government argues that even if Ramirez-Alaniz were to be deported, his possible reentry would pose a substantial risk of danger to persons or property in the United States given his "history of illegally reentering" the country.

While Ramirez-Alaniz focuses his argument on the effect of his conduct in Mexico, based on his assumption that if released, he would be deported to Mexico immediately, the argument overlooks the fact that if released, Ramirez-Alaniz would, based on the record before us, be released into the United States. There is no proceeding or detainer pending against Ramirez-Alaniz that would preclude his presence in the United States upon release. And Ramirez-Alaniz has provided no factual basis upon which to conclude that the district court's finding that his release would pose a high risk of dangerousness "[w]hether he is released in the United States <u>or</u> his native Mexico" was clearly erroneous. (Emphasis added). Thus, because Ramirez-Alaniz's release would pose a risk of danger to persons or property <u>in the United States</u>, we need not address his argument that § 4246 does not apply extraterritorially.

Ramirez-Alaniz also contends that even if his release would pose some risk of danger to persons or property in the United

12

States, allowing a court in the United States to civilly commit foreign nationals, such as him, who face possible deportation would effectively commit such persons to "serve de facto life sentences at the expense of American taxpayers." He argues that reading § 4246 to permit these life sentences would be an "absurd result" and would raise "serious constitutional questions."

We find this argument beset by speculation and hyperbole. Section 4246 itself provides numerous avenues by which Ramirez-Alaniz can be released after commitment. See 18 U.S.C. § 4246(d)(2), (e), (g). In addition, Ramirez-Alaniz has challenged neither the government's statement at the commitment hearing that it was exploring informal processes to move him to Mexico nor the government's statement in its brief that Immigration and Customs Enforcement "still has the option to initiate deportation proceedings against him" even now that he is civilly committed.

As to his concern regarding "constitutional problems raised by the district court's decision," we recognize that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Addington v. Texas, 441 U.S. 418, 425 (1979). But Ramirez-Alaniz does not argue that he was denied due process through the commitment hearing. And whether due process would be denied with respect

to any future effort by him to obtain release can, at this time, only be speculative.

At bottom, we affirm the civil commitment order based on the district court's finding of risk of harm in the United States, without determining whether 18 U.S.C. § 4246 extends to risks that Ramirez-Alaniz's release might also pose outside the United States.

AFFIRMED