THE STATE EX REL. KROGER COMPANY, APPELLANT, *v.* INDUSTRIAL COMMISSION OF

OHIO, APPELLEE.

[Cite as *State ex rel. Kroger Co. v. Indus. Comm.* (1997), 80 Ohio St.3d 483.]

*Workers' compensation — Award of temporary total disability compensation by*

*Industrial Commission not an abuse of discretion, when.*

(No. 95-901 — Submitted October 7, 1997 — Decided December 31, 1997.)

APPEAL from the Court of Appeals for Franklin County, No. 94APD03-422.

Claimant, Wilma C. Williamson, was industrially injured in 1989 while working for appellant, Kroger Company. She related the following description of her injury to a medical examiner:

"She said she was injured while in a meat cooler. The electricity went out and she fells [*sic*] backwards with some boxes falling around her. She injured her low back and right shoulder. I asked her if she was scared at the time. 'Yea, I got scared because it was dark and I couldn't find my way out. It took me a while. The fire alarm went off and I thought maybe there was a fire in the store and I was locked in there. The door locked after you went in and you had to hit this thing in the center of the door to open it.' "

Her workers' compensation claim was ultimately allowed for "lumbosacral strain; cervical strain; anxiety disorder with panic attacks." In 1992, claimant applied for temporary total disability compensation from June 10, 1991 and to continue. She accompanied her motion with a November 6, 1991 C-84 "physician's report supplemental" from Dr. Marguerite M. Blythe, her treating psychiatrist. Under the heading "Present complaints and condition(s)," Dr. Blythe listed "Post Traumatic Stress Disorder (Secondary to Industrial Accident), Panic Attacks, Dysthymia." Objective findings were noted as "Poor sleep, panic attacks and nightmares." Subjectively, she found "feelings of impending doom, terror of

small spaces such as elevators." Dr. Blythe stated that claimant's recovery had been delayed because of claimant's inability to tolerate higher doses of medication. An estimated return to work date was given as "possibly 12/92[,] no predicted date."

Dr. Blythe submitted two more C-84's in addition to four narratives. Her December 11, 1992 C-84 estimated a January 1, 1994 return to work date. Complaints were listed as "anxiety, trouble leaving house, fear of elevators, [decreased] sleep." A decreased ability to cope, weight loss, depression, and nerves were also noted. A July 1, 1993 C-84 extended claimant's disability to June 1994, based on "flashbacks, panic, nervousness, [and] trouble sleeping."

Dr. Blythe's narratives are also significant. On September 13, 1991, she wrote:

"She [claimant] had no fear of anything prior to the accident. Apparently on the day of the accident in addition to the falling objects there had been failure of the electricity, a fire bell had gone off, she had gone back into the Kroger Building and the lights had gone on and then off and she had been terrified in addition to being physically injured.

"Since the time of the accident she has been afraid of elevators and small spaces. She has been afraid of driving on expressways. She has been afraid of doing something that will cause other people harm. I believe that these fears and phobias are directly related to the accident and to the trauma she encountered both in being in a darkened building and having boxes fall on her, and having a fire bell go off that she didn't know was real or not real, and in her fear of not being able to get out of the industrial situation at the time that it occurred.

"* * *

2

"My current working diagnosis of Mrs. Williamson is that she has a generalize[d] anxiety disorder with panic attacks. I believe that both of these problems were caused by the accident which she sustained when working at Kroger on June 5, 1989. I believe that her psychiatric condition is a direct result of her industrial accident and that it is not an exacerbation or an aggravation of a pre-existing condition. I do not believe she had any psychiatric condition prior to the accident.

"I believe that Mrs. Williamson has some disability from the panic attacks and the generalized anxiety disorder. This mostly shows itself as being afraid to be in small spaces, such as elevators. This fear is so severe that she will walk up eight or ten flights of stairs rather than take an elevator. In addition, she avoids driving on the expressways and places where there are loud noises and sudden changes. I believe that this interferes with her ability to function and that it would also affect her return to work, in that she has problems in dealing with sudden changes, which is required in most jobs."

Three weeks later, on October 6, 1991, Dr. Blythe stated:

"Ms[.] Williamson had no psychiatric history, prior to her industrial accident at Kroger June 5th[,] 1989. At that time, because of a combination of being/feeling trapped, lights going off in the building, and fear/smell/sounds of possible fire (fire bell went off), Ms[.] Williamson was terrified. Since that time she has had problems with nightmares, panic when in small, confined spaces, depression, as well as the back pain for which she was treated.

"My best diagnosis is that Ms[.] Williamson suffers from Post Traumatic Stress Disorder and Panic attacks, both directly related to the industrial accident. In addition, she has dysthymia (chronic depression) from the duration of time her problems have gone on. These psychiatric illnesses significantly impair her daily

3

functioning. For example, she cannot take elevators because of her fear of the small spaces after being locked/confined in the refrigerator at Kroger. She sleeps badly and often wakes up many times in the night (something which wasn't [t]rue before the accident), leaving it difficult for her to function the next day. She is chronically tired, fearful, and at times has such panic attacks she is afraid she is going to die immediately.

"* * * I feel she is fairly seriously impaired from her psychiatric illnesses and given the period this has lasted, has a somewhat guarded prognosis for this resolving itself, either with treatment or spontaneously."

Approximately a year later, Dr. Blythe reported:

"Ms[.] Williamson is currently being treated for anxiety disorder with panic attacks. The current addition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Revised 3rd Edition (DSM-III-R) breaks these two conditions into two separate diagnostic categories, 300.01 and 300.02. * * *

"Concerning Generalized Anxiety Disorder, Ms[.] Williamson never was particularly anxious about anything prior to her experience at Kroger in June 1989. She now has unrealistic fears about her family * * *. She has unrealistic worries about her health * * *. She does have some anxieties related to Panic * * * but not only ones related to that, which is why I have given her both diagnoses. I do not believe her to be psychotic nor do I believe the anxiety to be part of a depression. * * *

"* * *

"At times in the past she has had specific panic attacks, albeit not often enough to merit naming Panic Attacks [as] a primary diagnosis. That is, she does not have at present one attack a week; however, by history she did in 1989 and

4

probably did shortly before I met her in June 1991. Initially these came 'out of the blue' and for no reason * * * then she started thinking that certain stimuli caused them[,] such as thinking about going into a[n] elevator. Technically, being afraid of single things is more related to Phobias * * * which Ms[.] Williamson may also have had occur since her accident. However, the intensity of the panic * * * happens suddenly and more accurately describes 'Panic' than Phobia * * * though going into closed spaces can now evoke such panic. This may be the start of agoraphobia[,] since that is how people start avoiding p[l]aces they * * * mistakenly associate with Panic (and how agoraphobia is believed to start) but I did not feel she in any other way meets either the diagnosis of agoraphobia or of simple phobia. * * * Because of this I said she had 'anxiety with Panic attacks.' [T]echnically, there is no DSM-IIIR diagnosis for Panic attacks used simply as a symptom. I suppose she could be called Post Traumatic Stress Disorder * * * since she has recurrent intrusive recollections of the accident, as well as dreams about it; she avoids things that remind her of the accident, such as elevators, memories of the accident and feels detached from her surroundings as evidenced by the fact she has taken less pleasure in her grandchildren than she expected, and has sleep problems, irritability, difficulty concentrating which has lasted more than one mo[n]th. I did not call her disorder Post Traumatic Stress as I do not believe her accident was caused by 'an event that is outside the range of human experience.' Some diagnosticians now argue that this is not necessary for this diagnosis. * * *

"Nevertheless, I believe Ms[.] Williamson has a fairly severe form of anxiety, which permeates all aspects of h[e]r life, and is afraid to do some things for fear she will have a panic attack or a nightmare. This has markedly curtailed her pleasure in life and her ability to function. Whether one calls this Anxiety

5

with Panic Symptoms, or Post Traumatic Stress Disorder, or Anxiety with Panic and stress induced phobias, I believe Ms. Williamson's anxiety markedly disturbs her ability to function. * * *"

Finally, in a lengthy December 31, 1993 report, Dr. Blythe indicated:

"While the DSM-IIIR would say that PTSD [post-traumatic stress disorder] is caused by 'extraordinary events,' such as war or explosions that cause dozens of injuries, most psychiatrists now believe that PTSD does not require an 'extraordinary' event, to be caused, but that a very frightening one, such as explosion or a rape, can cause it * * * especially when such an explosion also inflicts injury to the individual as a person * * * that is, affects the person's sense of self and sense of self-determination. While Ms[.] Williamson did not suffer serious breaks of bones or burns, the emotional situation that occurred at Kroger was of the same sort that happens to people who are in serious accidents and who come close to dying. This patient had no previous psychiatric problems prior to the experience which I believe caused the PTSD. The patient now has many signs and symptoms which are similar to those of Viet Nam Veterans who are diagnosed as having PTSD * * *.

"* * *

"When the patient has had bad dreams, fears and flashbacks, she has tried at times in the past to avoid having them by 'pretending everything is OK.' She still is terrified of small spaces such as elevators * * *. Any report of similar instances on radio or TV exacerbates her fears of what almost happened to her and what did happen to her and again makes her fear for her family.

"The patient's interest in her own life (and that of the family) was significantly diminished after the incident * * *. She couldn't do things she enjoyed before. She felt cheated out of the way the life was 'supposed' to be lived

6

by how she was having to live it. * * * She couldn't do normal things * * *. She felt estranged from other people because she 'wasn't being normal.' She was quite hopeless about life for a period of time. This hopelessness was not (and now is not) her usual affect, but the depression still happens. The patient has some severe flashbacks, bad dreams, terror, and self-defeating behaviors * * * such as being unable to get out of the house to come to appointments.

"* * *

"The duration of her problem is over four years * * * though the definition of PTSD requires it to be more than one month * * * and it still persists though it is, unfortunately, no less serious now than it was when I met her in 1991, two years after the accident. It is not now accompanied by totally incapacitating depression. However, significant, and very unpredictable impairment has occurred since 1989, according to Dr[.] Lerner's records, and definitely since I have known her * * * with a few hours being OK and then days or weeks of things being terrible and then things being OK again briefly for a few hours or a day. The patient never experiences long periods of being well * * * of not having symptoms of anxiety, panic, phobias and PTSD * * * and even the periods of 'better times' are marred by an unpredictability that makes planning for the future difficult. The fact that this continues after four and half years makes my prognosis quite guarded. I would have expected that if she were going to be over her problems, she would be by now * * * and she isn't.

"I have treated this patient for an anxiety disorder with panic attacks. The current DSM-IIIR breaks these symptoms into two diagnoses, that of Panic Disorder 300.01, and Generalized Anxiety Disorder 300.02. I also believe, and I have believed since I met her, that she has Post Traumatic Stress Disorder (PTSD) 309.89. It is not at all uncommon for patients to have symptoms that cross specific

7

diagnostic categories, but all her symptoms fall into the anxiety/fearfulness category. She is significantly disabled from her psychological problems. That is, her problems are causing her significant disturbance in her personal relationships, her ability to work and her personal enjoyment of life. Based on what has happened in the past two and half years I have known her, I believe her condition will not improve and that she needs to be considered disabled. * * *"

A district hearing officer of appellee, Industrial Commission of Ohio, awarded temporary total disability compensation:

"* * * [F]rom 7/18/91 to 1/1/94. * * *

"It is the order of the Hearing Officer that further temporary total disability compensation is to be paid upon submission of medical evidence which documents the claimant's continued inability to return to and perform the duties of her former position of employment as a result of the allowed conditions in this claim.

"The Hearing Officer finds that the claimant's condition remains temporary. The claimant has not reached maximum medical improvement and the claimant's condition has not become permanent.

"The Hearing Officer further finds that the claimant remains unable to return to and perform the duties of her former position of employment as a Deli Clerk as a result of this industrial injury.

"Temporary Total Disability Compensation is continued upon submission of medical proof documenting Claimant's inability to return to her former place of employment.

"* * *

"This order is based upon the medical reports of Dr. Blythe, the evidence in the file and the evidence adduced at hearing."

8

The order was administratively affirmed.

Kroger filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in awarding claimant temporary total disability compensation. Finding Dr. Blythe's medical reports to be "some evidence" in support of the commission's determination, the court of appeals denied the writ.

This cause is now before this court upon an appeal as of right.

_____

*Porter, Wright, Morris & Arthur, Karl J. Sutter* and *Charles J. Kurtz II*, for appellant.

*Betty D. Montgomery*, Attorney General, and *William L. McDonald*, Assistant Attorney General, for appellee.

*John L. Berg*, for Wilma C. Williamson.

_____

***Per Curiam***. Kroger challenges the award of temporary total disability compensation from July 18, 1991 to January 1, 1994, and gives two reasons why it should be set aside. Neither has merit.

Kroger's first argument asserts that claimant has reached permanency/maximum medical improvement ("MMI"), a finding of which bars temporary total disability compensation. R.C. 4123.56(A); *State ex rel. Ramirez v. Indus. Comm.* (1982), 69 Ohio St.2d 630, 23 O.O.3d 518, 433 N.E.2d 586; *Vulcan Materials Co. v. Indus. Comm.* (1986), 25 Ohio St.3d 31, 25 OBR 26, 494 N.E.2d 1125. Kroger initially claims that the return-to-work dates on Dr. Blythe's C-84's are so "distant [and] unrealistic" as to compel a finding of MMI.

The commission's broad evidentiary powers certainly permit it to discount a C-84 on the basis alleged by Kroger. In this case, however, the estimated return-

to-work dates offered by Dr. Blythe were only eleven to twelve months distant. This is not unreasonable or unrealistic, nor is it uncommon.

Kroger also cites Dr. Blythe's October 6, 1991 assessment of a "somewhat guarded prognosis" as evidence of MMI. While this is language that would support an MMI finding (see *State ex rel. Cassity v. Montgomery Cty. Dept. of Sanitation* [1990], 49 Ohio St.3d 47, 550 N.E.2d 474), it does not compel it.

"Somewhat guarded prognosis" can be interpreted two ways. As *Cassity* shows, it can be read in favor of MMI. However, it can also suggest that improvement, while unlikely, has not been ruled out. In *State ex rel. Copeland Corp. v. Indus. Comm.* (1990), 53 Ohio St.3d 238, 559 N.E.2d 1310, we discussed a doctor's report that could be construed as either supporting or negating MMI:

"In the case before us, Dr. Braunlin stated in his report of September 17, 1986:

" 'I feel that he [claimant] has likely reached maximal recovery unless he attends a chronic pain and stress center which I feel might be quite helpful in dealing with the multitude of problems of which he still complains. * * * Unless additional improvement is made in a rehabilitation type program, I feel that he has likely reached maximal recovery.'

"Dr. Braunlin's comments are susceptible [of] differing interpretations. Given his suggestion that claimant may benefit from attendance at a chronic pain and stress clinic, we find that the commission's interpretation of that report did not constitute an abuse of discretion. It is thus some evidence supporting the commission's conclusion that claimant's disability was not yet permanent." *Id.* at 239, 559 N.E.2d at 1311.

The commission did not, therefore, abuse its discretion in refusing to interpret the October 6, 1991 report as evidence of maximum medical improvement.

Kroger also challenges what it perceives to be Dr. Blythe's partial reliance on nonallowed conditions. Psychologically, the claim has been allowed for "anxiety disorder with panic attacks." Dr. Blythe's November 6, 1991 C-84, however, lists claimant's present condition as "Post Traumatic Stress Disorder (Secondary to Industrial Accident), Panic Attacks, Dysthymia." PTSD and dysthymia are also discussed in Dr. Blythe's narratives, prompting Kroger's objection. Upon review, this argument proves unpersuasive.

Compensable disability must arise exclusively from the claim's allowed conditions. *Fox v. Indus. Comm.* (1955), 162 Ohio St. 569, 55 O.O. 472, 125 N.E.2d 1. Ideally, the diagnosis contained on a disability form should mirror exactly the condition(s) allowed by the commission and, where it does not, closer examination may be warranted. Some degree of flexibility, however, seems particularly important when dealing with psychiatric conditions. As the Washington Supreme Court observed:

"Psychology and psychiatry are imprecise disciplines. Unlike the biological sciences, their methods of investigation are primarily subjective and most of their findings are not based on physically observable evidence." *Tyson v. Tyson* (1986), 107 Wash. 2d 72, 78, 727 P. 2d 226, 229.

The United States Supreme Court, in a criminal case, made a similar comment:

"Psychiatric diagnosis in contrast, is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert

11

physician to offer definite conclusions about any particular patient." *Addington v. Texas* (1979), 441 U.S. 418, 430, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323, 333.

The reference to the nature of psychological diagnoses does not imply that these diagnoses are freely interchangeable. Clearly, major depression and paranoia are not the same and, in this case, all three disorders, PTSD, dysthymia, and anxiety disorder with panic attacks, are distinct. Nevertheless, we find that the multiple psychological diagnoses are not fatal to claimant's compensation application. There are three reasons for this.

First, regardless of the label attached, Dr. Blythe consistently referred to the same symptoms as being the cause of disability. Second, many of the symptoms are common to all three maladies. This largely explains why Dr. Blythe has had difficulty categorizing the disorder. Finally, Dr. Blythe has always related the relevant symptomatology to the industrial accident.

Cumulatively, this indicates that the debilitating symptoms are industrially related. This is not a situation in which diagnostic flexibility will allow a physician to surreptitiously treat a claimant for a nonindustrial ailment. The problem seems to rest solely on Dr. Blythe's understandable inability to affix a single diagnosis to symptoms that fit several categories. For these reasons, the commission's reliance on Dr. Blythe's reports is not an abuse of discretion, and the award of temporary total disability compensation from July 18, 1991 to January 1, 1994 is upheld.

Kroger lastly contends that the commission abused its discretion in extending temporary total disability compensation beyond December 31, 1993, given Dr. Blythe's declaration of MMI of that same date. The commission responds that it did not award temporary total disability compensation beyond that date, rendering Kroger's argument premature. The commission is factually

correct.  What Kroger is really arguing is that the commission erred in failing to declare claimant had reached MMI as of December 31, 1993.  Kroger, however, did not raise this argument below.  It cannot, therefore, be raised at this time.

The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.