In the Matter of Barry BEAR, Alleged to be Mentally Retarded.

Barry BEAR, Archie Bear, Jr., and Anna Bear, Appellants,

v.

WOODWARD STATE HOSPITAL SCHOOL, Appellee.

No. 97–15.

Supreme Court of Iowa.

Filed March 25, 1998

David F. Staudt of Staudt Law Office, Boone, for appellants.

Jim P. Robbins, County Attorney, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN, and TERNUS, JJ.

LARSON, Justice.

In 1989 we held that Barry Bear, then eleven, was a child in need of assistance under Iowa Code chapter 232 (1987) because of his parents' refusal to send him to school. *In re B.B.*, 440 N.W.2d 594 (Iowa 1989). Four years later, we held that he was a child in need of assistance because of his mother's obsession with his health and his father's failure to intervene on Barry's behalf. We ordered Barry to be placed in foster care. *In re B.B.*, 500 N.W.2d 9 (Iowa 1993). In June 1995 Barry, seventeen by then, was adjudicated to be retarded.[1] He was committed to the Woodward State Hospital and School in Woodward, Iowa, pursuant to Iowa Code section 222.31 (1995), primarily because of his aggression toward himself and others. His condition is diagnosed as (1) mild intellectual retardation, that is, he is retarded in his capacity to learn; and (2) moderate adaptive retardation, which means that he is challenged in his ability to care for himself. In May 1996 Barry's attorney/guardian ad litem filed a petition for discharge from the hospital school under Iowa Code sections 222.42 and 222.43. The hospital school (school), through the Boone County attorney, resisted it. The juvenile court denied the petition, and we affirm.

## I. *The Proper Forum.*

█ The question of the proper forum for resolving a petition for discharge has apparently never been considered by this court in the circumstances of this case. Iowa Code section 222.16A (1997) (1995 Iowa Acts chapter 82, section 10) provides that "[t]he juvenile court has exclusive original jurisdiction in any court proceedings concerning a minor pursuant to this chapter." Barry was a minor at the time of his original commitment under section 222.31 (1995), but he was an adult when he petitioned for discharge. Chapter 222 is silent as to whether the juvenile court has continuing jurisdiction to hear petitions for discharge filed by an adult, but we conclude that it does, provided that the petitioner's original confinement was as a minor. *Cf.* Iowa Code § 232.61(2) ("In determining ... jurisdiction [in child-in-need-of-assistance cases] the age and marital status of the child at the time the proceedings are initiated is controlling."); Iowa Code § 232.8(1)(a) ("The juvenile court has exclusive original jurisdiction in proceedings concerning ... an adult who is alleged to have committed a delinquent act prior to having become an adult. ...").

## II. *Principles of Review.*

█ Petitions for adjudication of retardation and commitment under chapter 222 are required by Iowa Code section 222.26 to be heard in equity. However, chapter 222 does not specifically provide that proceedings for discharge from such commitments are to be in equity. Nevertheless, because the proceedings for the original adjudication and commitment are required to be in equity, it is logical that petitions for discharge would be heard in equity as well. Our review of the court's ruling on the petition for discharge under sections 222.42 and 222.43 is therefore de novo.

Iowa Code section 222.42 provides the mechanics for seeking a discharge:

A petition for the discharge of a person who has been committed to an institution, a hospital-school, or a special unit under

---

1. The superintendent of the Woodward State Hospital School petitioned for this adjudication and, pursuant to Iowa Code section 222.18, requested that the Boone County attorney represent him in that matter. Section 222.18 also provides that the county attorney shall represent "all public officials and superintendents in all matters pertaining to the duties imposed upon them by this chapter." The county attorney, therefore, represented the interests of the hospital school on this petition for discharge.

this chapter or to vary such order of commitment may at any time after six months from the date of such commitment be filed by the person committed or by any reputable person.

Section 222.43 provides the grounds for discharge:

> Discharges and modifications of orders may be made on any of· the following grounds:
>
> 1. That the person adjudged to be mentally retarded is not mentally retarded.
>
> 2. That the person adjudged to be mentally retarded has improved as to be capable of self care.
>
> 3. *That the relatives or friends of the mentally retarded person are able. and willing to support and care for the mentally retarded person and request the person's discharge, and in the judgment of the superintendent of the institution or hospital-school having charge of the person, no harmful consequences are likely to follow such discharge.*
>
> 4. That, for any other cause, said discharge should be made or such modification should be entered.

(Emphasis added.)

The petition here did not claim any of the grounds for discharge under subsections (1), (2), or (4). The petition, based on subsection (3), alleged:

> 4. The Respondent's parents have contacted the [attorney/guardian ad litem] and have indicated that they are able and willing to support and care for the Respondent.
>
> 5. The *Respondent's parents* believe no harmful consequences are likely to follow such discharge.
>
> 6. Placement with the Respondent's parents at their home in Tama County is the least restrictive placement available to the Respondent.

(Emphasis added.) (The parents suggested other grounds at the trial, but they are not raised on the appeal, and we do not consider them.)

**2.** Asserting that no harmful consequences will

### III. *The Petition for Discharge.*

Iowa Code section 222.43(3) requires a petition for discharge to allege that "in the judgment of the *superintendent of the ... hospital-school* ... no harmful consequences are likely to follow such discharge." (Emphasis ˙added.) The petition here did not comply with this requirement; it alleged only that the *parents* believed˙ that no harmful consequences would follow. However, the school did not challenge the petition on the ground that it was insufficient under Iowa Code section 222.43(3), and we therefore do not resolve that issue.

### IV. *The Burden of Proof.*

Chapter 222 is silent as to which party has the burden of proof on a petition for discharge. Neither party raised the issue at trial. The court suggested that Barry had the burden of proof but made r̈o specific ruling on it; it simply concluded that it would make no practical difference which party had the burden because the court would deny the petition in either event.

We have not previously had an opportunity to discuss the burden of proof on a petition for discharge under Iowa Code chapter 222. However, in *In re Hedin,* 528 N.W.2d 567 (Iowa 1995), we considered the analogous question of who had the burden of proof on an application for termination of a voluntary guardianship. In *Hedin* we held that, if a prima facie case of the ward's decision-making capacity is presented, the burden is˙ placed on the guardian to go forward with clear and convincing evidence to show that the guardianship should be continued. *Hedin,* 528 N.W.2d at 581.

Adapting the ruling in *Hedin* to this case, and based on the statutory require-· ments for a petition for discharge under section 222.43(3), we hold that a petitioner must make a prima facie case for discharge by producing evidence that (1) the relatives or friends of the confined person are able and willing to provide support and care, and (2) no harmful consequences are likely to follow such discharge.[2]

follow, we believe, is substantial compliance with

If the petitioner establishes a prima facie case, the resister must then go forward to establish that the discharge should not be ordered. The evidence must be by clear and convincing evidence because "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 330–31 (1979); *see also Hedin,* 528 N.W.2d at 581.

### V. *The Evidence.*

A. *The prima facie showing.* Barry, through his attorney/guardian ad litem, presented evidence from five witnesses: his mother (Anna Bear) and four employees of the Woodward hospital school (including a treatment program manager, a staff psychologist, a social worker, and a staff medical doctor). The county attorney used the same witnesses, and a report from a psychiatrist as well, in the resistance to the petition.

Anna Bear testified that she and Barry's father were capable of providing care for Barry. Barry's aggressiveness was usually directed at school staff members and this would not be a problem at home, according to her. Anna, however, continued to protest the administration of any medications to control Barry's aggression. There is no question that Barry's parents are committed to what they perceive to be his best interests, although the school contends that their efforts are not rational.

While Barry's prima facie case for discharge is not strong, we hold that it is minimally sufficient to shift the burden to the school to establish that Barry's confinement should continue. We reach that conclusion in part because of the constitution's great solicitude for liberty interests and our own general view that home care is ordinarily preferable to institutional care.

B. *The available alternatives.* Before deciding the ultimate question of whether Barry should be discharged, we must consider what options are available to the court. Iowa Code section 222.45 provides:

> On the hearing [for discharge], the court may discharge the mentally retarded person from all supervision, control, and care, or may transfer the person from a public institution to a private institution, or vice versa, or transfer the person from a special unit to a hospital-school, or vice versa, as the court deems appropriate under all the circumstances.

Therefore, the court may (1) leave Barry in his present status in the school, (2) fully discharge him from all supervision, or (3) transfer him to a private institution. There is no disposition under the statute that would permit Barry to live at home under the supervision of the school.

Barry seeks a full discharge. The school seeks to retain supervision of him at least long enough to obtain a placement in a smaller, less restrictive facility.

C. *The school's evidence.* All of the witnesses, even those called by Barry (except for his mother), urged the court not to discharge Barry at this time, primarily because he is likely to injure himself or others. While medication will control his aggressive behavior, his mother has adamantly refused to allow his medication, and that will be a major problem if he is discharged. An outside psychiatrist who examined Barry for the court stated his conclusions:

Goal:

To prevent recurrence of aggressive behaviors.

Recommendations:

A. Patient should continue on his current type of Medication [regimen] which is keeping him stable.

B. Should the medication be discontinued, he is likely to become very aggressive as he has been in the past, such as start exhibiting aggressive behaviors such as scratch and bite, kicking, hitting, and using objects as weapons as well as

---

section 222.43(3), which literally requires an assertion that in the opinion of the *superintendent* no harmful consequences will follow. To require literal compliance with this section might raise constitutional questions because it would give the superintendent unilateral power to veto a petition for discharge and thereby supplant the authority of the court.

self-injury behaviors in the form of hand biting and head banging, etc.

C. Should the medication be discontinued, his ability to carry on with activities of daily living may be significantly reduced. And he may become not only dangerous to others and himself, but also to his parents.

D. In my professional opinion, patient should remain under the supervision of Woodward Hospital–School as he currently seems to be functioning at his best.

Barry's medications include Serentil to control his aggressiveness, Imipramine, an antidepressant, and Artane to counteract side effects.

This psychiatrist's assessment was not contradicted by any professional evidence in the record. His conclusions were borne out by the records of the school, which demonstrated that, when Barry's medications were reduced or eliminated, the incidents of aggressive behavior increased dramatically.

The witnesses' greatest concern was Barry's aggressive behavior. The treatment program manager at the school stated that as many as seven times a month the staff noticed acts of aggressive behavior, and their severity was even more of a concern than their frequency. She testified that Barry's aggressive behavior usually was the result of the reduction in medication and not, as Anna Bear testified, simply a reaction against authority. One incident recounted by this witness and the other staff members occurred when Barry returned from a visit in his parents' home when he had not been given his medications. He had a violent outburst of temper and threw a knife at a staff person, cutting his face. When asked if she had any recommendations as to the possibility of Barry going home right now, the treatment program manager testified:

Right now I feel it would not be in his best interest to go home. I have a very strong concern on the use of medications, that Barry would not be given those medications. I think in taking a look at what's happened with Barry when we've tried to reduce the medication and the seriousness of those consequences, that would concern

me greatly. In dealing with Anna in the past as far as medication giving, you know, she's expressed to us that Barry doesn't need those medications, which is a conflict with our belief. That would worry me as to what would happen if Barry did not get the medications.

Barry's psychologist expressed the same concerns about Barry's aggressiveness. The psychologist prepared a graph that showed the correlation between the school's attempt to reduce Barry's medication and the increased incidents of aggression. He agreed that the aggression was triggered by a lack of medication and not by environmental factors as suggested by Barry's mother. He testified that the ideal situation is to get Barry completely off medication as quickly as possible, if he can tolerate it. At this time, however, he did not see that as being feasible. He testified that Barry might always need some medication.

The social worker at the school was asked about a discharge:

Q. What is the present recommendation of the IDT [interdisciplinary team] for Barry concerning going home to live with his family right now? A. We do not favor that at all. We would oppose that.

Q. Okay. And what's your own stand on that as his case worker? A. I oppose that too. I'm concerned about the medication issue. I believe Barry does need the medications because it has been shown without them, he has gone back to the behaviors, of most concern, threatening to harm other people.

We conclude that the school has shown by clear and convincing evidence that harmful consequences are likely to follow a discharge at this time. *See* Iowa Code § 222.43(3). In fact, the evidence from the psychiatrist, psychologist, social worker, and program manager, uniformly agreeing that discharge would be a mistake, was uncontradicted by any professional testimony. While Anna contends that the outbursts of aggression are solely in response to school staff members and not the lack of medication, we do not agree. Even according to Anna's own testimony, Barry had aggressive outbursts out-

side of the school setting. These acts of aggression are the result of a mental condition that can be adequately controlled by medications if Barry's mother would allow him to take advantage of them. Sadly, she will not.

The evidence shows that Barry is a good candidate for placement, through the school, in a smaller, less restrictive setting—preferably closer to his parents' home near Tama. In fact, as of the time of trial Barry had been placed by the school on a waiting list for such placement.

We conclude that Barry is not an acceptable candidate for discharge at this time; however, this does not close the door on that possibility at some time in the future. Iowa Code section 222.46 provides:

> The denial of one petition for discharge or modification shall be no bar to another on the same or different grounds within a reasonable time thereafter, such reasonable time to be determined by the court.

Perhaps before long a discharge may safely be ordered, but that time is not now. Accordingly, we affirm the judgment of the juvenile court denying the petition for discharge.

**AFFIRMED.**