

FILED

May 18 2020, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Michael E. Hunt
Rachel M. Rogers
Monroe County Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

James L. Whitlatch
Kathryn DeWeese
Bunger & Robertson
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

A.S.,

*Appellant-Respondent,*

v.

Indiana University Health
Bloomington Hospital,

*Appellee-Petitioner*

May 18, 2020

Court of Appeals Case No.
19A-MH-3044

Appeal from the Monroe Circuit
Court

The Honorable Stephen R. Galvin,
Judge

Trial Court Cause No.
53C07-1911-MH-452

**May, Judge.**

A.S. appeals following her 90-day commitment to Indiana University Health Bloomington Hospital ("Hospital").[1] A.S. raises four issues, which we consolidate, reorder, and restate as:

> 1. Whether the trial court abused its discretion by admitting hearsay evidence;

> 2. Whether the evidence was sufficient to support the trial court's determinations that A.S. was gravely disabled and a danger to herself; and

> 3. Whether the trial court erred in determining the treatment plan imposed was the least-restrictive plan available.

We affirm.

# Facts and Procedural History

On November 26, 2019, Hospital filed an Application for Emergency Detention of a Mentally Ill and Dangerous or Gravely Disabled Person regarding A.S. The Application indicated A.S. was "psychotic and she has been walking in the

---

[1] Hospital notes A.S.'s temporary commitment was to expire on March 2, 2020, which technically renders moot A.S.'s appeal of her commitment. (Appellee's Br. at 12.) Hospital also notes that we generally address these appeals under a public interest exception to the mootness doctrine, (*id*.), and we choose to do so again in this case. *See T.W. v. St. Vincent Hospital & Health Care Center, Inc.*, 121 N.E.3d 1039, 1042 (Ind. 2019) ("Indiana recognizes a public interest exception to the mootness doctrine, which may be invoked when the issue involves a question of great public importance which is likely to recur.") (quoting *Matter of Tina T.*, 579 N.E.2d 48, 54 (Ind. 1991)).

middle of the highway multiple times." (App. Vol. II at 8.) The court granted the emergency detention that day.

[3] On November 27, 2019, Hospital petitioned for temporary involuntary commitment of A.S. The court heard evidence and argument on December 3, 2019, and it entered an order for temporary commitment that same day. The trial court found A.S. to have schizophrenia, which rendered her both dangerous to herself and gravely disabled. The order permitted Hospital to keep A.S. for up to 90 days, provided Hospital permission to draw blood from A.S. as necessary for laboratory tests, and granted Hospital authority to treat A.S. with anti-psychotic medications.

# Discussion and Decision

[4] Civil commitment proceedings have two purposes – to protect both the public and the rights of the person for whom involuntary commitment is sought. *In re Civil Commitment of T.K.*, 27 N.E.3d 271, 273 (Ind. 2015). "The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom," *id.*, because commitment is accompanied by "serious stigma and adverse social consequences[.]" *Id.* Accordingly, proceedings for civil commitment are subject to the requirements of the Due Process Clause. *Id.* (citing *Addington v. Texas*, 441 U.S. 418, 425-26 (1979)).

# 1. Admission of Evidence

A.S. asserts "[t]he trial court erroneously admitted inadmissible hearsay evidence . . . ." (Appellant's Br. at 8.) We review the trial court's admission of evidence for an abuse of discretion. *Henderson v. Henderson*, 139 N.E.3d 227, 236 (Ind. Ct. App. 2019). An abuse of discretion occurred if the trial court's decision was clearly against the logic and effect of the facts and circumstances before the court. *Id.*

In particular, A.S. points to statements made by the police who brought her to the emergency room for detention, and she claims "all information used to detain, and then commit, A.S.,[sic] was communicated through a loop that started with the police and ended with Dr. Mayer, without him ever speaking directly to them." (Appellant's Br. at 25.) Thus, A.S. asserts, Dr. Mayer's testimony about what the police reported was inadmissible hearsay[2] that could not meet the criteria for admission under the exception for a "Statement Made for Medical Diagnosis or Treatment."[3] Ind. Evidence Rule 803(4).

When Hospital called its psychiatrist, Dr. Carey Mayer, to the stand, Hospital's counsel asked if A.S. was "willing to stipulate to the fact that Dr. Mayer is a

---

[2] Hearsay is "a statement that: "(1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). "Hearsay is not admissible unless these rules or other law provides otherwise." Evid. Rule 802.

[3] Hearsay is admissible under the Medical Diagnosis or Treatment exception if the statement was "made by a person seeking medical diagnosis or treatment;" was "made for—and is reasonable pertinent to—medical diagnosis or treatment;" and "describes medical history; past or present symptoms, pain or sensations; their inception; or their general cause." Evid. R. 803(4).

board certified psychiatrist qualified to render his medical opinion." (Tr. Vol. II at 4.) Counsel for A.S. responded, "Yes[.]" (*Id.*) Dr. Mayer testified he is A.S.'s "attending psychiatrist" and had "seen her daily since" her admission on November 26, 2019. (*Id.* at 5.) Dr. Mayer also testified he diagnosed A.S. as having schizophrenia based on her behavior at Hospital and based on information gathered from other sources, including Hospital's Emergency Department, A.S.'s family, and police reports. The following exchange then occurred:

> **[Hospital Counsel]:** What, to start off, what behaviors have you observed since she's been here on the unit?
>
> **[Dr. Mayer]:** Well she acts very inappropriately. She's invariably agitated, has made delusional statements such as that she is Jesus. She was [sic] actually came to the attention of the police when she was walking in traffic. My understanding is that there was [sic] actually some car wrecks that were created by that. Police were called and she had made comments to the police and or
>
> **[A.S. Counsel]:** I would object to this. There was no direct observation, I believe.
>
> **[The Court]:** Your response, Counsel?
>
> **[Hospital Counsel]:** Doctor, is this type of information, police reports, reports from other practitioners, other providers, is that information, family members, is that information that you typically rely on in reaching a diagnosis?

**[Dr. Mayer]:** Yes.

**[The Court]:** For purposes, for diagnostic purposes, I will allow the testimony.

(*Id.* at 6-7.)

[8] Thus, contrary to A.S.'s assertion, the trial court did not admit into evidence Dr. Mayer's repetition of what the police reported. Instead, the trial court allowed Dr. Mayer to explain what the police reported "for diagnostic purposes." (*Id.* at 7.) Pursuant to Evidence Rule 702(a), a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Furthermore, when a witness has been qualified as an expert under Rule 702, that person "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field." Evid. R. 703.

[9] Here, when Dr. Mayer took the stand, A.S. stipulated that he was an expert qualified to give a medical opinion. (*See* Tr. Vol. II at 4.) Dr. Mayer also testified that police reports were one of the items typically relied on when rendering a mental health diagnosis. (*See id.* at 6.) As a result, Evidence Rule 703 allowed Dr. Mayer to rely on the police report when determining a

diagnosis for A.S. The trial court allowed Dr. Mayer to testify about the information from the police report not for evidentiary purposes but to explain how he reached his diagnosis. We presume that "trial courts know and follow the law," *Hecht v. Hecht*, --- N.E.3d ----, 2020 WL 1057248, *7 (Ind. Ct. App. March 5, 2020), and that a judge considers only the properly-admitted evidence when rendering a judgment. *See Konopasek v. State*, 946 N.E.2d 23, 28 (Ind. 2011) ("We generally presume that in a proceeding tried to the bench a court renders its decisions solely on the basis of relevant and probative evidence."). A.S. has not demonstrated error in the trial court's allowing Dr. Mayer to state what the police reported in order to explain his opinion about A.S.'s diagnosis.

## 2. Sufficiency of Evidence

To comport with due process requirements, a person may not be committed without clear and convincing evidence in support thereof. *In re T.K.*, 27 N.E.3d at 273. When we review a determination made under that clear and convincing standard, we affirm "if, 'considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find [the necessary elements] proven by clear and convincing evidence.'" *Id*. (quoting *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 137 (Ind. 1988)).

To have a person committed, the petitioner – here, Hospital – must prove by clear and convincing evidence that:

> (1) the individual is mentally ill and either dangerous or gravely disabled; and

> (2) detention or commitment of that individual is appropriate.

Ind. Code § 12-26-2-5(e). Because the statute is written in the disjunctive, a petitioner need only prove the respondent is "either dangerous *or* gravely disabled." *Id*. (emphasis added); *see also M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 637 (Ind Ct. App. 2005) ("It is important to note that in order to carry its burden of proof, Clarian only had to prove that M.Z. was either gravely disabled *or* dangerous. It did not have to prove both of these elements.") (emphasis in original), *trans. denied*.

[12] For purposes of Indiana Code article 12-26, mental illness means "a psychiatric disorder that: (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function." Ind. Code § 12-7-2-130. Dangerous is defined as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." Ind. Code § 12-7-2-53. Gravely disabled means

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or

(2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Ind. Code § 12-7-2-96. Because the definition of grave disability is written in the disjunctive, the evidence needs to support only one of those two prongs for a person to be found gravely disabled. *See A.L. v Wishard Health Servs.*, 934 N.E.2d 755, 760 (Ind. Ct. App. 2010) ("When Indiana Code section 12-7-2-96(2) is at issue, the trial court need not find that the person in question is incapable of providing himself or herself with food or clothing[.]"), *trans. denied*.

[13] The trial court found A.S. was schizophrenic, gravely disabled, and a risk to herself. A.S. does not challenge the finding that she has a mental illness. Instead she challenges the sufficiency of the evidence demonstrating she was dangerous to herself and gravely disabled. We choose to address first whether the record supports the trial court finding A.S. was gravely disabled because of a "substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently." Ind. Code § 12-7-2-96(2). Our review of the record uncovered the following testimony:

> **[Dr. Mayer]:** I believe that she meets the criteria for being gravely impaired and that she represents a danger to herself because of her poor judgment and insight.
>
> **[Hospital Counsel]:** What is the basis for your opinion that she is gravely disabled? Do you believe that she has a substantial

impairment of her judgment or reasoning or behavior that results in an inability to function independently?

[Dr. Mayer]:  At this point in time, yes . . . .

[Hospital Counsel]:  Do you believe that she has insight into her illness or

[Dr. Mayer]: No . . . I do believe that she is still psychotic.  Still vitally needs this treatment and so far has been refusing.

(Tr. Vol. II at 8-9.)  In addition, Dr. Mayer explained:

[Dr. Mayer]:  So she has had a history of being psychotic.  She has said to staff on the unit that she's Jesus.  . . .  Come to find out from her mother, that this patient had a full scholarship to New York University and so she is very bright, but at age nineteen, she had a psychotic break where she was found by her roommates on the floor sobbing that she had created a black hole and it was going to destroy the world.  She was hospitalized for thirty days in one of the New York hospitals.  My understanding is that like now, she had refused medication up until the very end of her stay.  This patient has not had any continued or sustained outpatient treatment . . . .

(*Id.* at 7.)  Dr. Mayer also testified that A.S. "acts very inappropriately" at the hospital.  (*Id.* at 6.)  "She's invariably agitated [and] has made delusional statements such as that she is Jesus."  (*Id.*)  In the days before the hearing, A.S. had been "threatening towards staff."  (*Id.* at 21.)  "She is so psychotic, her judgment so impaired, that she needs the safety of a protective inpatient psychiatric unit.  Anything less than that, she could just walk away from."  (*Id.*

at 14.) Dr. Mayer also testified A.S.'s hygiene was "marginally okay" because she had begun taking showers, but she continued to be "dressed bizarrely." (*Id.* at 18.)

All that evidence demonstrates that A.S. continued to display behavior toward and around hospital staff that demonstrated a substantial impairment of her judgment and reasoning based on her mental illness.[4] A.S. was making delusional statements, was agitated and threatening toward staff, and had only marginal hygiene and dress. Under these facts, we affirm the trial court's determination that A.S. was gravely disabled due to her impaired judgment. *See, e.g.*, *Golub v. Giles*, 814 N.E.2d 1034, 1039 (Ind. Ct. App. 2004) (holding evidence sufficient to demonstrate grave disability), *trans. denied*.

## 3. Reasonableness of Treatment Order

"Our supreme court has recognized that a patient has a liberty interest in 'remaining free of unwarranted intrusions into his physical person and his mind, and 'it cannot be seriously disputed that forcible medication of a mental patient interferes with that liberty interest." *Civil Commitment of W.S. v. Eskenazi Health, Midtown Community Mental Health*, 23 N.E.3d 29, 35 (Ind. Ct. App.

---

[4] A.S. analogizes her case to other recent cases in which orders of commitment have been reversed for insufficient proof of grave disability. (*See* Appellant's Br. at 14-20.) As an example, A.S. cites *In re Commitment of D.S.*, 109 N.E.3d 1056 (Ind. Ct. App. 2018), in which a psychiatrist had alleged D.S. was gravely disabled because of the "incident" that brought her to the hospital and her refusal to admit her illness or take medications. Here, however, we have additional testimony about A.S.'s behavior at the hospital that demonstrates her continued disability because of her illness. Because the facts herein distinguish A.S.'s situation from those cases, we decline to follow them.

2014) (quoting *In re Mental Commitment of M.P.*, 510 N.E.2d 645, 646 (Ind. 1987)), *trans. denied*. To override a citizen's right to refuse treatment,

> The State must demonstrate by clear and convincing evidence that: 1) a current and individual medical assessment of the patient's condition has been made; 2) that it resulted in the honest belief of the psychiatrist that the medications will be a substantial benefit in treating the condition suffered, and not just in controlling the behavior of the individual; 3) and that the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient.

> Equally basic to court sanctionable forced medications are the following three limiting elements. First, the court must determine that there has been an evaluation of each and every other form of treatment and that each and every alternative form of treatment has been specifically rejected. It must be plain that there exists no less restrictive alternative treatment and that the treatment selected is reasonable and is the one which restricts the patient's liberty the least degree possible. Inherent in this standard is the possibility, that, due to the patient's objection, there may be no reasonable treatment available. This possibility is acceptable. The duty to provide treatment does not extend beyond reasonable methods. Second, the court must look to the cause of the commitment. Some handicapped persons cannot have their capacities increased by anti-psychotic medication. The drug therapy must be within the reasonable contemplation of the committing decree. And thirdly, the indefinite administration of these medications is not permissible. Many of these drugs have little or no curative value and their dangerousness increases with the period of ingestion. The court must curtail the time period with which they may be administered. If a patient does not substantially benefit from the medication, it should no longer be administered.

*Id.* (quoting *In re M.P.*, 510 N.E.2d at 647-68).

[16] The trial court found A.S. needed a 90-day commitment and Hospital was both an appropriate facility and the "least restrictive environment suitable for the necessary care, treatment and protection of" A.S. (App. Vol. II at 4.) In addition, the court found: "Each and every form of treatment, and each and every alternative form of treatment has specifically been evaluated by psychiatrists for Respondent[;]" (*id.*), and "There is not [sic] less restrictive alternative treatment and the treatment selected is reasonable and restricts [A.S.]'s liberty in the least possible degree." (*Id.*) Finally, the court ordered Hospital "is granted an order to treat with the following medication, unless [A.S.] does not specifically benefit from these medications: Invega Sustenna, Abilify Maintena, Haldol Decanoate, Immediate Release Zyprexa." (*Id.* at 5.) A.S. alleges the court's order failed to meet all three of the "limiting elements" outlined in *In re M.P.*, 510 N.E.2d at 647-48.

[17] A.S. complains there is no evidence in the record to "justify a forced medication order of four heavy, debilitating antipsychotic drugs," which A.S. calls "the most draconian combination of heavy antipsychotics available." (Appellant's Br. at 28.) However, A.S.'s argument, as with her claim about the admission of evidence, misrepresents the record. Dr. Mayer's testimony makes very plain that Hospital was not seeking an order to give A.S. all four of those anti-psychotic medications at one time:

> **[Hospital Counsel]:** Okay. You are also seeking a forced medication order?

**[Dr. Mayer]:** Yes.

**[Hospital Counsel]:** For which medication?

**[Dr. Mayer]:** For the anti-psychotic medications, I mean, we are, we have good evidence that she is psychotic and we feel that therefore needs to be on an anti-psychotic medication. And so we are asking the Court to allow us to use a forced medications so, because otherwise she's not going to volunteer for it. We are asking for the long-acting injectable medications of Invega Sustenna, Abilify Maintena, Haldol Deconoate and Immediate Release Zyprexa in the IM formulation.

**[Hospital Counsel]:** Okay. So in asking for all four of those medications, is that because you are not sure which will be best for her?

**[Dr. Mayer]:** Correct.

**[Hospital Counsel]:** Okay. So you are [sic] intention would not be to use all of those,

**[Dr. Mayer]:** Correct.

**[Hospital Counsel]:** it would be to figure out which one worked best for her?

**[Dr. Mayer]:** Right. Monotherapy at this point would be an appropriate place to start, so yes, it would just be one of those.

(Tr. Vol. II at 11-12.)

A.S. also argues the treatment cannot be the "least restrictive treatment available for A.S." because Dr. Mayer did not testify that any other medication was considered. (Appellant's Br. at 27.) However, after Dr. Mayer testified about the four anti-psychotics that might benefit A.S., this testimony occurred:

> **[Hospital Counsel]:** Are there any alternative medications that may work for her?
>
> **[Dr. Mayer]:** No.
>
> * * * * *
>
> **[Hospital Counsel]:** Okay. Do you believe that these medications will be of substantial benefit in treating her underlying condition and not just controlling her symptoms?
>
> **[Dr. Mayer]:** Yes.
>
> **[Hospital Counsel]:** Okay. Do you believe that the commitment and forced medication order at this time presents the least-restrictive environment that's necessary for her care and treatment?
>
> **[Dr. Mayer]:** Yes.
>
> **[Hospital Counsel]:** Have you considered any less restrictive alternatives?
>
> **[Dr. Mayer]:** Yes.

**[Hospital Counsel]:** And why, in your opinion, are none of those good options at this point?

**[Dr. Mayer]:** She is so psychotic, her judgment so impaired, that she needs the safety of a protective inpatient psychiatric unit. Anything less than that, she could just walk away from.

(Tr. Vol. II at 11-14.)

[19] Finally, A.S. complains that the third limiting element – curtailing the timeline for forced medication – "was never even addressed on the record at the Commitment Hearing." (Appellant's Br. at 28.) However, as the trial court authorized Hospital to keep A.S. for "a temporary period not to exceed ninety (90) days," (App. Vol II at 5), the timeline for forced medication is obviously limited to a period of ninety days. A.S. has not demonstrated error in the forced medication order.

# Conclusion

[20] The trial court did not admit into evidence the hearsay about which A.S. complains. Dr. Mayer's testimony provided clear and convincing evidence that A.S. was gravely disabled and that forced administration of anti-psychotic medication was warranted. Accordingly, we affirm.

[21] Affirmed.

Robb, J., and Vaidik, J., concur.