

FILED

Oct 30 2023, 9:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Andrew B. Howk
John D. French
Hall, Render, Killian, Heath &
Lyman
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil
Commitment of:

J.F.,

*Appellant-Respondent,*

v.

St. Vincent Hospital and Health
Care Center, Inc. d/b/a St.
Vincent Stress Center,

*Appellee-Petitioner.*

October 30, 2023

Court of Appeals Case No.
23A-MH-752

Appeal from the Marion Superior
Court, Probate Division

The Honorable David Certo, Judge

Trial Court Cause No.
49D08-2303-MH-9936

**Opinion by Judge Kenworthy**
Judges Bailey and Tavitas concur.

**Kenworthy, Judge.**

## Case Summary

[1] J.F. appeals her temporary involuntary commitment, arguing it was not supported by sufficient evidence. Because J.F.'s appeal is moot and does not fall within an exception to the mootness doctrine, we dismiss.

## Facts and Procedural History

[2] At the time of her most recent commitment hearing, J.F. was thirty-nine years old. She struggled with substance abuse and was diagnosed with "psychotic disorder unspecified." *Tr. Vol. 2* at 33. Early in January 2023, J.F.'s parents began to recognize a "significant" change in J.F.'s behavior—most notably an increase in severe paranoia and delusions. *Id.* at 13. At that time, J.F.'s paranoia focused on her employment. She believed her co-workers were part of a "crime family" who "targeted" and "harassed" her. *Id.* at 14. J.F. conveyed her fellow employees tried to run her over and were "triggering . . . [her] PTSD on purpose with loud noises and shouting and freaking [her] out." *Id.* at 47. J.F. would not elaborate to her parents because she believed her phone was hacked, arrests were being made, and the "FBI was involved." *Id.* at 14. Eventually, J.F. lost her job.

[3] On January 24, 2023, J.F.'s father returned to his home and found J.F. in his closet. When confronted, J.F. pleaded to him: "Please don't kill me. Please don't kill me." *Id.* at 15. The next day, J.F. "barricaded at the top of the stairs" at her parents' house. *Id.* at 15–16. When her parents went upstairs to investigate, they found J.F. and her two young children locked in the bathroom.

J.F.'s children were screaming and "crying uncontrollably." *Id.* at 16. Not recognizing her parents, J.F. inquired "Who are you?" and begged "don't kill us." *Id.* When recounting this incident, J.F. expressed she believed someone was threatening her kids because she "was getting weird messages . . . through Facebook" that would appear and then be deleted as if "someone was on that phone with [her]." *Id.* at 50. J.F. explained, "I was typing a note to myself, and I was typing something about the kids and someone else typed, 'They're going to die.' Like . . . someone was on there typing with me . . . like a ghost writer was typing with me." *Id.* After this event, J.F. was hospitalized.

[4] Following her release, J.F. lived in her car and a motel. Within a short time, J.F. was admitted at St. Vincent Hospital and Health Care Center, Inc. d/b/a St. Vincent Stress Center ("Stress Center"). In February 2023, the Stress Center unsuccessfully sought to involuntarily commit J.F. After this commitment hearing, J.F.'s parents lost contact with her for a couple of weeks.

[5] Early in March 2023, J.F. arrived at her parents' house just as her parents were leaving. Because her parents did not permit her to go into the house, J.F. waited outside. Once her father returned home, J.F. "threw her keys, her ID, and her phone . . . onto the ground and just took off . . . into the woods." *Id.* at 12. Concerned J.F. might commit suicide, J.F.'s parents called the police. The police located J.F. about 150 yards from the house sitting on a tarp in the woods. Although J.F. claimed she was just camping, it was about twenty-nine degrees outside and J.F. did not have proper clothes or camping supplies. J.F.'s parents "had enough," and asked for a no trespass order against J.F. *Id.* at 13.

After the incident, J.F. was transported to the Stress Center—her third hospitalization in three months.

[6] On March 10, 2023, the Stress Center filed a Report Following Emergency Detention and Physician Statement seeking the involuntary commitment of J.F.[1] Dr. Erika Cornett—the Stress Center's attending psychiatrist—treated J.F. during her February and March inpatient admissions. At J.F.'s March commitment hearing, Dr. Cornett recounted J.F.'s delusions and paranoid behavior. For example, J.F. had asked Dr. Cornett whether Dr. Cornett was going to mess with the clocks by making them jump forward and backward so J.F. did not know what time it was. And J.F. claimed Stress Center staff hid cameras in her room and were slipping her medications. Additionally, Dr. Cornett conveyed J.F. resisted taking her medication and lacks insight regarding the severity of her condition.

[7] According to Dr. Cornett, J.F.'s "decision making is impaired" due to her paranoia. *Id.* at 34. Dr. Cornett further explained all J.F.'s decisions are based on her paranoia; thus, J.F. is "unable to make decisions that are safe to her."

---

[1] J.F. contends the trial court and the Stress Center cannot rely on an incident that occurred about a month and a half prior to the commitment hearing. *See Appellant's Br.* at 19 n.5. We disagree. Indiana Code Section 12-26-7-5 permits a trial court to involuntarily commit an individual after "completion of the hearing" *and* "consideration of the record." Therefore, the trial court could have properly considered any information contained in the record—including testimony regarding J.F.'s recent behavior, prior hospitalizations, and previous petitions for commitment. *See Golub v. Giles*, 814 N.E.2d 1034, 1039 (Ind. Ct. App. 2004), (noting the trial court could properly consider the respondent's five-year history of mental illness requiring hospitalizations and causing paranoia, delusional thoughts, and threatening and destructive behavior), *trans. denied*.

*Id.* In Dr. Cornett's opinion, J.F. is gravely disabled. At the conclusion of the hearing, the trial court determined J.F. suffered from a mental illness and was gravely disabled. The trial court did not find J.F. was dangerous. J.F. now appeals.

## J.F.'s Appeal Is Moot and No Exception to the Mootness Doctrine Applies

J.F. contends we should reach the merits of her claim although her term of commitment has expired.[2] A case is moot when "the controversy at issue has been ended, settled, or otherwise disposed of so that the court can give the parties no effective relief." *Civ. Commitment of E.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 188 N.E.3d 464, 466 (Ind. 2022) (per curiam). However, Indiana recognizes a "public interest exception to the mootness doctrine, which may be invoked when the issue involves a question of great public importance which is likely to recur." *Id.* (quoting *Matter of Tina T.*, 579 N.E.2d 48, 54 (Ind. 1991)). For over twenty years, this Court has "routinely considered the merits of [appeals of expired temporary civil commitment orders] despite finding them moot." *Id.* at 467. We do so because a civil commitment, regardless of purpose, has a "'very significant impact on the individual' and 'constitutes a significant deprivation of liberty that requires due process protection.'" *Id.* (quoting *Addington v. Texas*, 441 U.S. 418, 425–26 (1979)).

---

[2] Regarding mootness, the Stress Center "leaves to this court's discretion whether or not J.F. has satisfied the necessary exception for review and takes no position with regard to the same." *Appellee's Br.* at 11 n.1.

Although this Court has "broad discretion" to decide whether the public interest exception to mootness applies, we must exercise this discretion "thoughtfully and thoroughly" and on a "case-by-case basis." *Id.* at 465–67. Cases addressing novel issues, developing case law on a complicated topic, or presenting a close call are especially appropriate for consideration on the merits. *Id.* at 467. Because a hallmark of a moot case is a court's inability to provide effective relief, *see Civ. Commitment of T.W. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 121 N.E.3d 1039, 1042 (Ind. 2019), appellate courts are not required to issue an opinion in every moot case, *E.F.*, 188 N.E.3d at 467. Judicial opinions invoking the public-interest exception "are, for all practical purposes, advisory opinions." *Id.* (quoting *I.J. v. State*, 178 N.E.3d 798, 799 (Ind. 2022) (per curiam)). And courts should avoid issuing advisory opinions. *See Snyder v. King*, 958 N.E.2d 764, 786 (Ind. 2011).

Just recently, this Court considered the merits of appeals from expired temporary commitment orders without invoking the public interest exception to the mootness doctrine. *See Civ. Commitment of C.P. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, ___ N.E.3d ___, 2023 WL 5965625, No. 22A-MH-2960 (Ind. Ct. App. Sept. 14, 2023); *see also Civ. Commitment of M.T. v. Cmty. Health Network*, ___ N.E.3d ___, 2023 WL 5965629, No. 23A-MH-341 (Ind. Ct. App. Sept. 14, 2023). Instead, in *C.P.* and *M.T.*, this Court addressed the merits of appeals based on the "harmful collateral consequences" that accompany commitment

orders.[3] *See C.P.*, ___ N.E.3d at ___, 2023 WL 5965625, at \*6; *see also M.T.*, ___ N.E.3d at ___, 2023 WL 5965629, at \*4. As explained in *C.P.*, Indiana appellate courts have applied the "collateral consequences" doctrine to hold that appeals are not moot where review of appeals on their merits may still provide meaningful relief. *C.P.*, ___ N.E.3d at ___, 2023 WL 5965625, at \*5 (surveying cases where appellate courts have invoked the collateral-consequences doctrine to review the merits of appeals where the order at issue, if invalid and left undisturbed, could contribute to a future adverse finding against the appellant); *see also In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014) (holding an appeal was not moot based on the "long-lasting collateral consequences" that accompany CHINS adjudications). With both the public interest exception and the collateral consequences doctrine in mind, we turn to J.F.'s appeal.

[11] Here, J.F.'s appeal does not address a novel issue, present a close call, or provide an opportunity to develop case law on a complicated topic. *Cf., e.g., T.W.*, 121 N.E.3d at 1042 (choosing to address a moot temporary commitment because the appeal involved the important public question of the probate

---

[3] In *T.W.*, the parties before the Court had not developed a record on possible "harmful collateral consequences" from the commitment orders aside from the terms of those commitments. 121 N.E.3d at 1044, n.5. So, the Court left open the possibility respondents in civil commitment cases could seek relief from the collateral consequences caused by invalid commitment orders in the trial court. *See id*; *see also E.F.*, 188 N.E.3d at 466. On properly presented records, *C.P* and *M.T.* reached the question left open by the Supreme Court and held the respondents' appeals were not moot even though the terms of their commitments had expired because of the collateral consequences accompanying the respondents' involuntary commitment orders. *C.P.*, ___ N.E.3d at ___, 2023 WL 5965625, at \*6; *M.T.*, ___ N.E.3d at ___, 2023 WL 5965629, at \*4–5.

commissioner's authority to enter civil commitment orders). Accordingly, we do not believe it is appropriate to invoke the public interest exception to reach the merits of J.F.'s appeal. *See E.F.*, 188 N.E.3d at 467 (noting cases addressing novel issues, developing case law on a complicated topic, or presenting a close call are especially appropriate for consideration on the merits).

[12] Further, we decline to consider the merits of J.F.'s appeal based on the collateral consequences doctrine. In our view, we should apply this doctrine only when the appellant demonstrates a particularized collateral consequence flowing from the temporary commitment order. *See e.g., C.P.*, ___ N.E.3d at ___, 2023 WL 5965625, at *5 (holding the collateral consequences doctrine applied when the appellant had "long exercised his right to possess a handgun" and his temporary commitment order, if invalid but left in place, would prohibit him from continuing to possess any firearms). Although J.F. raised a collateral consequence—an addition to her medical history which would make future involuntary commitment proceedings against her more likely to succeed—she has not sufficiently shown a particularized harmful consequence would befall her if this Court declined to reach the merits of her appeal. Thus, we will not apply the collateral consequences doctrine.

## Conclusion

[13] Because J.F.'s civil commitment order is moot and no exception to the mootness doctrine applies, we dismiss.

[14] Dismissed.

Bailey, J., and Tavitas, J., concur.